## COMMONWEALTH *vs.* FRANCIS P. SALEMME.

Middlesex.   December 12, 1979. — January 22, 1981.

Present: BROWN, GREANEY, & PERRETTA, JJ.

*Attorney at Law,* Conflict of interest. *Practice, Criminal,* Assistance of
counsel, Disclosure of evidence, Instructions to Jury. *Assault. Rea-
sonable Doubt.*

At the trial of a defendant on charges arising from a bombing incident in
which an attorney was severely injured, certain statements by the
defense counsel to the judge and to the victim with respect to the
possibility that portions of the victim's testimony might fall within the
attorney-client privilege did not require the judge to make a par-
ticularized inquiry into the possibility of a conflict of interest resulting
from an attorney-client relationship between the defense counsel and
the victim where it was reasonable for the judge to infer that the
defense counsel was referring to the attorney-client relationship be-
tween the victim and his former clients and not to a relationship be-
tween the defense counsel and the victim. [210-214]
There was no support in the record of proceedings on a motion for a new
trial for the defendant's contention that the attorney who represented
the defendant at his trial had had an attorney-client relationship with
the victim or that the defense counsel's conduct of the trial was influ-
enced by his purported belief that an attorney-client privilege existed.
[214-218]
A motion for a new trial of a criminal case on the ground that the Com-
monwealth had failed to disclose certain exculpatory evidence was
properly denied where the information in question was not capable of
creating a reasonable doubt that did not otherwise exist. [218-223]
At the trial of indictments charging the defendant with assault and bat-
tery by means of a dangerous weapon and assault with intent to
murder, a portion of the judge's charge in which he instructed the jury
that if they found the defendant guilty on one of the indictments they
should find him guilty on both, while in error, did not, in the context
of the entire charge, gravely prejudice the defendant or give rise to a
substantial likelihood of a miscarriage of justice. [224-225]
At a criminal trial, the judge's instructions to the jury with respect to
reasonable doubt, in the course of which the judge described a specific
situation wherein a hypothetical person was about to make a major or

critical decision in his life, did not require a new trial where the judge repeatedly instructed the jurors that the Commonwealth was required to prove the defendant's guilt beyond a reasonable doubt and to a moral certainty and where the defendant failed to show either grave prejudice or a substantial likelihood that a miscarriage of justice had occurred. [225-229]

MOTIONS for a new trial filed in the Superior Court on September 28, 1977, and January 22, 1979.

The proceedings were heard by *Donahue,* J.

*Richard J. Vita* for the defendant.

*Peter W. Agnes, Jr.,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. In 1968, one John E. Fitzgerald, Jr., was severely injured when he started the engine of his car and a bomb exploded. The defendant was indicted and found guilty of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, and assault with intent to murder, G. L. c. 265, § 18. After numerous attempts to reverse his convictions,[1] the defendant brought a series of motions for a new trial, all of which were heard and denied by the same judge who had presided at the defendant's trial. This appeal is from those denials. We affirm the orders.

The facts surrounding the defendant's trial and the evidence presented are fully recited in *Commonwealth* v. *Salemme,* 3 Mass. App. Ct. 102 (1975), and we need not repeat them. The following issues are presently before us:

---

[1] The defendant's convictions were first affirmed on direct appeal in *Commonwealth* v. *Salemme,* 3 Mass. App. Ct. 102 (1975). There the defendant presented four allegations of error: (1) the judge's refusal to interrogate prospective jurors individually and in accordance with the inquiries requested by defense counsel; (2) the judge's refusal to declare a mistrial based upon the prosecutor's opening argument; (3) the judge's allowance of certain testimony in evidence; and (4) the judge's instruction to the jury after seven and one half hours of deliberation that the matter "must be decided either now or at some future time." Those same allegations of error were also rejected in *Salemme* v. *Ristaino,* 587 F.2d 81 (1st Cir. 1978). In *Salemme* v. *Commonwealth,* 370 Mass. 421 (1976), the defendant unsuccessfully contended that the multiple convictions and consecutive sentences thereon constituted double jeopardy.

(1) whether the defendant was denied the effective assistance of counsel because of his attorney's alleged "personal obligations" to a Commonwealth witness, the victim Mr. Fitzgerald; (2) whether the Commonwealth impeded the defendant's defense by allegedly withholding favorable and material evidence from him; (3) whether a portion of the judge's jury charge instructed them to return a verdict of guilty; and (4) whether the judge's charge trivialized the concept of reasonable doubt (see *Commonwealth* v. *Ferreira*, 373 Mass. 116 [1977]) requiring reversal of the convictions under *Commonwealth* v. *Grace*, 381 Mass. 753 (1980).[2]

The judge made detailed and comprehensive findings of fact and rulings of law on the first three issues. We relate the facts as the judge found them to be on each issue "because our review of the transcript reveals that his findings are well warranted on the evidence elicited at the hearing[s]." *Commonwealth* v. *Buonopane*, 9 Mass. App. Ct. 651, 654 (1980), and cases therein collected.

1. *Conflict of interest.*[3] The defendant alleges that his attorney, Mr. F. Lee Bailey, had an attorney-client relationship with Mr. Fitzgerald, that this fact was made known to the judge at the commencement of trial, that neither the judge nor Mr. Bailey took proper action to insure that the defendant would receive representation by one with undivided loyalty to him, and that as a result of those facts it

---

[2] After hearing oral argument of the parties on the first three issues, we instructed counsel to submit briefs on the fourth issue. We did so for the reasons set out in *Commonwealth* v. *Brattman*, 10 Mass. App. Ct. 579, 579-580 (1980), and cases therein collected.

[3] The defendant attacks the judge's findings on this issue as unsupported by the record and in disregard of the evidence. We cannot agree. The judge specifically stated that his findings were based primarily on Mr. Fitzgerald's testimony, notwithstanding the existence of other testimony because "I have considered that testimony, and I give it little weight." We will not disturb that finding. *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 543 (1971). *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979).

was never revealed to the jury that one James O'Toole had a motive to commit the crimes in issue.

The name of James O'Toole, who was incarcerated at the time of the bombing and who died six months prior to this 1973 trial, surfaces in these proceedings in the following manner. Some time in December of 1965, or January of 1966, Mr. Bailey and Mr. Fitzgerald were representing co-defendants in a trial in Suffolk County. When the jury began its deliberations, the two men went to dinner and then to Mr. Bailey's office to await the verdicts, which were not returned until 2:00 A.M. During their wait, the two men consumed a considerable amount of alcohol. They became somewhat "uninhibited" and "jocular." Mr. Bailey and Mr. Fitzgerald then engaged in conversation about a gossip item that had appeared in a newspaper. The item concerned an alleged affair between an attorney and a woman. Each of the men expressed the opinion that the other was the attorney in question. As the conversation progressed, the woman's identity became clear. She was Dorothy Barshard, O'Toole's "girlfriend." Mr. Fitzgerald had represented O'Toole in the past. Mr. Fitzgerald told Mr. Bailey, during this conversation, that he, Fitzgerald, might get shot by O'Toole, or that he might shoot O'Toole, in which event he would retain Mr. Bailey to represent him. The defendant asserts that this conversation gave rise to an attorney-client relationship between Mr. Bailey and Mr. Fitzgerald and created the conflict of interest between himself and Mr. Fitzgerald.

To bolster his theory that an attorney-client relationship existed between Mr. Bailey and Mr. Fitzgerald, the defendant points to certain remarks made by Mr. Bailey at the beginning of the trial. Mr. Bailey indicated to the judge that he would like the opportunity to interview Mr. Fitzgerald regarding certain information that Mr. Fitzgerald "may want to waive, but I am telling you that is certainly attorney-client privilege." The judge ordered a recess so that this interview could be conducted. The defendant next points to the following statement made by Mr. Bailey to

Mr. Fitzgerald during the interview: "I should like very much in this case to inconvenience you as little as possible. There are all kinds of collateral matters that could crop up, and I am making an effort to weave around them so that the testimony is not in any way going to be embarrassing. But obviously people who have a motive to do you harm, obviously somebody blew your leg off, but Salemme wasn't the one . . ." The defendant next points to Mr. Bailey's representation to the judge after this interview: "I had a discussion with Mr. Fitzgerald to keep the cross-examination very tight, if possible." The defendant relies upon these remarks to argue that they required the judge to make a "particularized inquiry" into the area of a possible conflict. See *United States* v. *Donahue,* 560 F.2d 1039, 1044 (1st Cir. 1977); *Commonwealth* v. *Wright,* 376 Mass. 725, 734 (1978); *Commonwealth* v. *Davis,* 376 Mass. 777, 784-785 (1978). We first dispose of the defendant's contention that these statements required the judge to conduct a voir dire hearing on the possibility of a conflict of interest because of Mr. Bailey's alleged loyalty to Mr. Fitzgerald rather than to the defendant.

The statements must be viewed in the context in which they were made. Immediately prior to the commencement of trial, Mr. Bailey asked to see Mr. Fitzgerald's testimony before the grand jury. He told the judge that he wished to review that testimony and interview Mr. Fitzgerald before trial witnesses were called because, as he stated to the judge, "We can go through these witnesses very rapidly . . . until we get down to the issue who did it. But I am not going to make an intelligent decision as to where to waive cross-examination until at least I have an opportunity to try and talk to this fellow." He further stated, "[T]here is a problem there, because part of the material that I think they are talking to Mr. Fitzgerald about is clearly within the attorney-client privilege — If that is waived, that is fine." The prosecutor then interjected that he had spoken with Mr. Fitzgerald the preceding evening and that Mr. Fitzgerald could recall "only one minute item of attorney-client

privilege. He made a phone call and asked him a question."
Mr. Bailey replied, "He may want to waive, but I am telling
you that is certainly attorney-client privilege." The judge
then arranged for Mr. Bailey to interview Mr. Fitzgerald; in
the meantime, the judge examined the grand jury minutes.
The grand jury minutes in this case are replete with refer-
ences to the association of Mr. Fitzgerald with certain "per-
sons of notoriety," *Commonwealth* v. *Salemme*, 3 Mass.
App. Ct. at 106, such as Patriarca, Zannino, also known as
Larry Baione, Barboza, Steve Flemmi, Jerry Anguilo, and
Phil Waggenheim. After Mr. Bailey had interviewed Mr.
Fitzgerald and the judge had reviewed the grand jury testi-
mony, Mr. Bailey stated that he would keep the cross-exam-
ination of Mr. Fitzgerald "very tight."

There is nothing in these remarks which should have
alerted the judge to that of which the defendant now com-
plains, i.e., that because of an alleged attorney-client rela-
tionship with Mr. Fitzgerald, Mr. Bailey refrained from
cross-examining him on certain topics. Indeed, we con-
clude that the record and the circumstances of the case at
that juncture in the proceedings support the judge's finding
"that the only possible inference the Court could draw, if
any, was that Fitzgerald had informed the Grand Jury of his
relationship with a number of underworld people, some of
which involved an attorney-client relationship, and that
Bailey had to keep his cross-examination of Fitzgerald
'tight,' so that none of these matters came to the attention of
the petit jury now empanelled." We also note that until
Mr. Bailey interviewed Mr. Fitzgerald, Mr. Fitzgerald also
interpreted the general reference to attorney-client infor-
mation as relating to information he had obtained from *his*
former clients.[4] We conclude that the judge had no infor-

---

[4] When Mr. Bailey interviewed Mr. Fitzgerald and posited a general in-
quiry concerning whether he intended to invoke the attorney-client
privilege, Mr. Fitzgerald responded: "I can't say at this time if I would
assert the privilege or not. I think that there were many cases in which
you and I have had some relationship, Barboza, McLaughlin, so many
things that we have talked about which may fall within that privilege,

mation which imposed on him an affirmative duty to make inquiry of the defendant or his counsel on this topic. Contrast *Commonwealth* v. *Wright,* 376 Mass. at 734; *Commonwealth* v. *Davis,* 376 Mass. at 784-785. ·

We next examine the record to see whether Mr. Bailey was given confidential information by Mr. Fitzgerald which served to restrict Mr. Bailey's cross-examination of Mr. Fitzgerald or otherwise divide his loyalty to the defendant. *Commonwealth* v. *Smith,* 362 Mass. 782, 784 (1973). In so doing we are mindful that "[a]lthough a defendant need not prove how he was prejudiced by the existence of a conflict, 'the burden lies with [him] to prove, without relying on speculation, that a conflict existed.' *Commonwealth* v. *Bolduc,* 375 Mass. 530, 541 (1978)." *Commonwealth* v. *Wright,* 376 Mass. at 732. See also *Commonwealth* v. *Soffen,* 377 Mass. 433, 437 (1979). "Moreover, if a more tenuous conflict appears, we might still reverse the judgment[s] on a showing of material prejudice." *Id.* But see *Commonwealth* v. *Cobb,* 379 Mass. 456, 459, vacated in part and remanded for consideration in light of *Cuyler* v. *Sullivan,* 446 U.S. 335 (1980). *Massachusetts* v. *Hurley,* 449 U.S. 809 (1980). See also *Commonwealth* v. *Mello, ante* 70, 71, & n.2 (1980). ("The dual approach analysis to proving a conflict of interest used in *Cobb* and used by us here is more favorable to the defendant than that required under *Cuyler*").

The thrust of the defendant's argument is that Mr. Bailey learned of O'Toole's possible motive to harm Mr. Fitzgerald through an attorney-client relationship with him, that Mr. Fitzgerald did not waive his privilege on this point, and that as a result Mr. Bailey did not pursue O'Toole's possible motive during the course of the defendant's trial. The defendant relies primarily on Mr. Bailey's testimony at the

and I would not at this time know whether or not I would assert it and I would expect the District Attorney, if questions were raised in that area, to ask for a voir dire. So at which time I would have the opportunity to determine whether it would affect the attorney-client privilege or not."

hearing on the motion to the effect that he regarded the O'Toole-Barshard information as privileged and that although Mr. Fitzgerald stated that he waived the privilege, if any, on this point, Mr. Bailey did not deem the waiver satisfactory. The record, however, does not support the existence of an attorney-client relationship between Mr. Bailey and Mr. Fitzgerald. At no time did Mr. Fitzgerald consult with Mr. Bailey about O'Toole on a formal, professional basis. The only occasion upon which the topic arose was while the two men were engaged in conversation as friends and professional colleagues and were speaking in a "jocular" fashion after consuming a great deal of alcohol. Mr. Bailey neither opened a file on Mr. Fitzgerald's behalf, nor did he take any other action which was consistent with representation of a client. See *Commonwealth* v. *Wright*, 376 Mass. at 730 n.3. See also Hughes, Evidence § 161 (1961); Leach & Liacos, Massachusetts Evidence 141-144 (4th ed. 1967); McCormick, Evidence 179-182 (2d ed. 1972).

Further, we reject the defendant's contention that even if a privilege did not in fact exist, Mr. Bailey nonetheless believed a privilege existed and bound himself by it because he was dissatisfied with Mr. Fitzgerald's waiver. See *Commonwealth* v. *Rondeau*, 378 Mass. 408, 416 n.7 (1979) ("The conflict engendered in the attorney's own mind may have unmeasurable adverse effects on the client's interests. It is the conflict alone which renders assistance ineffective"). The notion that Mr. Bailey's actions in representing the defendant were influenced by this purported belief of a privilege has no support in the record. Mr. Fitzgerald testified at the hearing that during the pretrial interview by Mr. Bailey, he, Mr. Fitzgerald, waived the privilege concerning their O'Toole-Barshard conversation when he became aware of the fact that Mr. Bailey was seeking such a waiver. He testified that he told Mr. Bailey, "I waive it. You want to use it, you use it. I don't think there was an attorney-client privilege, but if you want to use it, you use it." Mr. Bailey's explanation as to why he did not question

Mr. Fitzgerald about a possible motive on O'Toole's part demonstrates,[5] in our view, that his restraint was not due to any purported conflict of interest or divided loyalty. When the testimony given by Mr. Bailey is viewed with Mr. Fitzgerald's complete response to Mr. Bailey's inquiry concerning waiver,[6] it is clear that Mr. Bailey's failure to question

---

[5] More particularly, when the judge asked Mr. Bailey whether he felt that "the attorney-client privilege would have been allowed to stand if it became critical during the course of the trial to show that someone else other than your client had the means and/or motive to place the dynamite in Fitzgerald's car?," and whether he felt that "the attorney-client privilege can stand in the way of a possible acquittal of a defendant by showing that someone else other than the defendant committed the crime?," Mr. Bailey's responses were quite consistent with the judge's assessment of the situation at the time Mr. Bailey stated his cross-examination would be tight. "This is the position I was in. I did not bring the matter to your attention until after my pretrial statement that I had a problem. The reason is I had a deal with Fitzgerald, I thought — and part of it is set forth in the transcript and part of it is off the record — that if he would stop throwing the Mafia around to taint up the trial, I would leave him alone in his personal affairs as a fair trade. We had limited success in causing him to do that. [See *Commonwealth* v. *Salemme*, 3 Mass. App. Ct. at 106] . . . and I was very fearful the next name I was going to hear was Larry Baione in a conversation that was hearsay through any door that I might have opened. [See note 6, *infra*.] So, I confess my judgment was a mixture of a whole bunch of different factors and also predicated, in part, upon the fact that I thought that Daddieco [an admitted accomplice in the crimes in issue] was the totally incredible witness, even in the circumstances of the case, and didn't want to open any doors that would give him corroboration in any form . . . . I must say that I think it was my decision not to pursue the O'Toole matter under the circumstances of this case as they existed when Fitzgerald was at the point where he either had to be released from cross-examination, attacked by intrinsic evidence, someone else that heard him announce his fear of O'Toole and brought back as a rebuttal witness, God know[s] what to say, and on balance, decided to try to contain him by not raising the subject matter . . . . [I]f I had intrinsic evidence to back up my assertion that O'Toole wanted to kill him and satisfied myself there was not going to be a price on it, I would most certainly have brought out the fact that a short time before the bombing he had stated: Yes, this man wants to kill me, and here are the reasons."

[6] The following is a detailed recital of Mr. Fitzgerald's response to Mr. Bailey's inquiry: "Then [Mr. Bailey] said, 'I want to talk to you about Barshard and O'Toole. And I said, 'Lee, that is a lot of crap. You just told me that Stevie Flemmi put the bomb in the car, and I'm telling you

Mr. Fitzgerald about O'Toole was not dictated by any concern for Mr. Fitzgerald but was motivated by deliberate defense strategy.

Having concluded "that the defendant has failed to establish a genuine conflict of interest . . . we have examined the record for evidence of material prejudice." *Commonwealth* v. *Soffen,* 377 Mass. at 440. See also *Commonwealth* v. *Davis,* 376 Mass. at 783. We have reviewed the grand jury minutes, the trial transcript and the transcript of the hearing on the motion, and we are unable to discern evidence of material prejudice to the defendant. We are particularly cognizant of the facts that the defendant was informed of Mr. Bailey's relationship with Mr. Fitzgerald before he retained Mr. Bailey as his attorney,[7] that Mr. Fitzgerald was not a critical witness against the defendant and

---

that Stevie and Frankie worked together, and you want to go in and screw around with Jimmy O'Toole's name before a jury.' I said, 'Do it, smartie, then you throw my state of mind into issue. If you throw my state of mind into issue, I will talk about your client. I will talk about Larry Baione. I will talk about Phil Waggenheim and I'll talk about Stevie Flemmi.' . . . And I said, 'Lee, you make your choice what you want to do,' [see note 5, *supra*] and I pointed out the fact to Lee, 'If you think that because of the name of a woman that you're going to prevent me from testifying, you're crazy, because,' I said, 'I went through that malarkey during the Deegan trial where they tried to bring this thing up and I don't care about it. It's irrelevant. Jimmy O'Toole had nothing to do with the bombing, Mr. Bailey, because you just told me the codefendant, Stevie Flemmi did it, and I tell you they kill together and don't do anything separately.'"

[7] On this point we note that Mr. Bailey testified at the hearing on the motion that he had made the defendant's brother aware of this problem with Mr. Fitzgerald and that the brother, in turn, had told the defendant. Additionally, before the defendant retained Mr. Bailey, Mr. Bailey visited him at the Billerica house of correction and again brought the matter to his attention: "I don't have a specific recollection of the exact exchange between myself and Frank, but I know that Fitzgerald and the problems associated with him — not only this one, but others — were discussed." Cf. *Commonwealth* v. *Davis,* 376 Mass. at 786 ("[A] defendant who is adequately informed yet fails to seek separate representation will be hard pressed to persuade us that he was deprived of a fair trial on account of a conflict of interest arising from joint representation").

that his testimony did not implicate the defendant as his assailant,[8] and that had Mr. Bailey delved into Mr. Fitzgerald's thoughts as to a possible motive by O'Toole to do him harm, the benefits, if any, of such interrogation would have paled when compared to the potential damage (see notes 5 and 6, *supra*) which Mr. Bailey was otherwise able to limit. See *Commonwealth* v. *Salemme*, 3 Mass. App. Ct. at 106. In sum, we believe that the defendant's problem was founded not upon a purported conflict of interest, but rather, upon the fact that the accomplice, Daddieco, and the victim were both witnesses who could have given far more damaging testimony than they did had Mr. Bailey not carefully limited their cross-examination.

2. *Exculpatory evidence.* The defendant again raised the issue of Mr. Fitzgerald's alleged fear of O'Toole by filing yet another motion for a new trial. In this motion he claimed that the Commonwealth had failed to provide him with information which was exculpatory and which would ultimately have established that O'Toole had the motive and opportunity to commit the offense and which would have substantially discredited both Daddieco and Mr. Fitzgerald. See e.g., *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 nn. 6 & 7 (1980).

The defendant asserts that the facts he relies upon to support this claim first came to his attention at the evidentiary hearing on his previous motion for a new trial. At that hearing one Maureen Dellamano testified that she knew Mr. Fitzgerald well and that he had told her that "he thought James O'Toole was going to kill him." Sergeant Charles Heitman of the Massachusetts State police testified at that same hearing but after Dellamano. He said that Dellamano had told him about four weeks prior to the bombing that she, Mr. Fitzgerald, one Leo Swartz, and one

---

[8] "[S]ubstantially the entire case against the defendant depended on the testimony of Daddieco which, the defendant claims, was unworthy of belief . . . . [I]n the final analysis, the Commonwealth's case had to stand or fall [on] the credibility of Daddieco." *Commonwealth* v. *Salemme*, 3 Mass. App. Ct. at 107.

Dominic Colantino had met at a restaurant to discuss Mr. Fitzgerald's representation of a man involved in an automobile accident and that "an incident" had occurred among the men. Heitman also testified that during his interview with Dellamano, she made no reference to O'Toole. Heitman had reduced this interview to writing, and he used his notes, "the Heitman report," while testifying; defense counsel had the full benefit of those notes while cross-examining him. However, the report was neither presented to the judge as an exhibit nor otherwise made a part of the record.

Five months after the denial of that motion for a new trial, the defendant filed the instant motion, asserting that Heitman's testimony was favorable to him and that it had not been produced pursuant to his pretrial motion for exculpatory evidence. He alleged that Heitman's testimony provided a basis for a reasonable inference that the investigation had not been limited to questioning Dellamano and that Heitman had questioned other persons as well. Pursuant to these allegations, the defendant requested an evidentiary hearing and the issuance of a subpoena duces tecum to the Massachusetts State police and the Attorney General's office ordering those agencies to comply with the defendant's pretrial motion for exculpatory evidence.[9] From the facts that defense counsel had reviewed the report and that no information had been elicited from Heitman concerning O'Toole, the judge inferred that "there was nothing in the report that was helpful" to the defendant. Additionally, he found that there was nothing of an exculpatory nature in Heitman's testimony. Accordingly, he denied this particular motion.

The defendant responded to this denial by filing a motion for reconsideration. The motion protested that an evidentiary hearing had not been held to examine Heitman fully.[10]

---

[9] Heitman had conducted his investigation in conjunction with his assignment to the Attorney General's office.

[10] In his motion for reconsideration the defendant stated that in his motion for a new trial he had only set out the general reasons for his re-

Such an examination, the defendant claimed, would "clearly show" that just four or five days after the bombing Mr. Fitzgerald "could only name Colantino and O'Toole as possible suspects and never mentioned Salemme." To substantiate this assertion, the defendant attached affidavits from Dellamano and Colantino to his motion. Dellamano recited in her affidavit that she had been interviewed by Heitman and that he had represented the following facts to her: he had been advised by Mr. Fitzgerald that there had been "a heated argument" among himself, Swartz, and Colantino at a restaurant a few days before the bombing, that Mr. Fitzgerald was very concerned about this incident, and that the police "were checking all the leads that John Fitzgerald had given them." Dellamano also stated in her affidavit that she had told Heitman that it was her memory that Colantino had threatened Mr. Fitzgerald during the restaurant incident and that she had told him that Mr. Fitzgerald "was in fear of these people because of Jimmy O'Toole."

Colantino alleged in his affidavit that he had been interviewed by Lieutenant Butler of the Massachusetts State police. Butler allegedly made the following remarks to Colantino: that after the argument among the three men at the restaurant, Mr. Fitzgerald secured a picture of Colantino from the police, that Mr. Fitzgerald had had that picture in his possession at the time of the bombing, that Mr. Fitzgerald had said the argument was prompted because of O'Toole, and that Mr. Fitzgerald was in fear of O'Toole. Colantino alleged that he had told Butler that he and O'Toole were close friends and that the argument concerned a waitress who is now Colantino's wife.

The judge found that the motion and affidavits were not sufficient basis for a reconsideration of his earlier ruling, and he denied the motion.

---

quested relief and that the motion was not intended to contain all the evidence in detail because an evidentiary hearing had been sought and anticipated.

It was within the judge's discretion to select the method by which he would consider, and reconsider, these motions. *Commonwealth* v. *Heffernan,* 350 Mass. 48, 54, cert. denied, 384 U.S. 960 (1966). *Commonwealth* v. *Cassesso,* 360 Mass. 570, 575-576 (1971), death penalty vacated sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972). We give special deference to the exercise of discretion where the judge ruling on the motion presided at the trial. See *Commonwealth* v. *Ellison,* 376 Mass. 1, 16-17 (1978). Here the judge acted well within his discretion in ruling on the motions without evidentiary hearings. He had complete familiarity with Mr. Fitzgerald's testimony, both before the grand jury and at trial, he had just completed a full evidentiary hearing on the defendant's previous motion where O'Toole's possible motive had been at issue and where both Dellamano and Mr. Fitzgerald had testified,[11] and he had affidavits before him on the issue of alleged exculpatory evidence.

The gist of the defendant's claim before us is that Heitman's testimony, when viewed with the Dellamano and Colantino affidavits, shows that prior to trial the Commonwealth had in its possession: (1) a statement from Mr. Fitzgerald to the State police in which he named those persons he believed had a motive to harm him; (2) knowledge that Heitman and Butler were making inquiries about Colantino and O'Toole rather than the defendant; and (3) a statement by Dellamano which would have impeached Mr. Fitzgerald's statement that he had never indicated that he was in fear of O'Toole. (As to this last assertion, see notes 3 and 11, *supra*). The defendant argues that, had this information been disclosed prior to trial, Mr. Bailey would have been free to use it.

We first note the nature of the defendant's pretrial motion for exculpatory evidence because "where there has been

---

[11] It should be recalled that at the conclusion of the prior hearing the judge made findings of fact in which he specifically acknowledged his awareness of testimony other than Mr. Fitzgerald's on this topic but that he credited it with little weight (see note 3, *supra*).

no defense request whatsoever or only a general request for 'all *Brady*' or 'all exculpatory' evidence, the prosecutor must disclose only that evidence which is in fact material." *Commonwealth* v. *Wilson,* 381 Mass. 90, 108-109 & n.39 (1980). The reason for this, as detailed in *Wilson,* is that "the due process clause does not require prosecutorial clairvoyance. Absent a request sufficiently specific to provide the Commonwealth with notice of the defendant['s] interest in a particular piece of evidence, the prosecution may legitimately be held responsible for disclosing only that evidence whose own character reveals its materiality." *Id.* at 109, citing *United States* v. *Agurs,* 427 U.S. 97, 110 (1976). The most liberal reading of that motion requires that we view it as a general request.[12] Moreover, the defendant cannot say that it was impossible for him to make a more specific request.[13] The statements in contention must, therefore, be examined, in view of the "entire record," to determine whether they were material in the sense that they were capable of creating "a reasonable doubt that did not otherwise exist." *United States* v. *Agurs,* 427 U.S. at 112. *Commonwealth* v. *Wilson,* 381 Mass. at 110.

Colantino's affidavit contains no statement concerning his own knowledge whether Mr. Fitzgerald feared O'Toole;

---

[12] The defendant requested to be furnished "with any and all information . . . of statements of promises, inducements or rewards of any kind or nature made to any witness . . ." It could even be argued that this is in fact not a request for exculpatory evidence in the true sense of the word. However, this is not here critical because the standard of review is the same where either no request or only a general request is made. *Commonwealth* v. *Wilson,* 381 Mass. at 109 n.39.

[13] See and compare *Commonwealth* v. *Wilson,* 381 Mass. at 109 n.40. The defendant's present assertion that, had Mr. Bailey known of this information, he would have used it flies in the face of the record before us. Mr. Bailey knew of the supposed O'Toole motive prior to trial. He could have pressed his discovery motion after Mr. Fitzgerald's waiver of the privilege if that was the only restraint against a more specific request in the first instance, or he could have pressed the issue notwithstanding the privilege if he deemed it to be imperative. (See note 5, *supra.*) But, in view of Mr. Fitzgerald's grand jury testimony and his statements to Mr. Bailey (see note 6, *supra*),

rather, he related only what the police had told him Mr. Fitzgerald had said. Dellamano recited that Mr. Fitzgerald had stated that he feared O'Toole. The most that the affidavits showed was that at the time of the bombing Mr. Fitzgerald feared O'Toole. That fact did not raise a reasonable doubt that did not otherwise exist. O'Toole was incarcerated at the time of the bombing, so it was impossible for him to have committed the crimes as a principal. The defendant has suggested that the alleged Barshard affair gave O'Toole a motive, but he did not even hint how this speculative motive might have culminated in the commission of the crimes. See and compare *Commonwealth* v. *Graziano*, 368 Mass. 325, 329-330 (1975). The absence of such an explanation and the want of any linking evidence rendered this information of little value as substantive or impeachment material because it depended upon a chain of inferences without an evidentiary basis.

Finally, we cannot disregard Daddieco's trial testimony and Mr. Fitzgerald's grand jury and motion testimony, which lead us to conclude that had Mr. Fitzgerald been asked whether he feared O'Toole, the Commonwealth would have seized the occasion to ask him whom else he feared. His reply, either through direct response or through use of his grand jury testimony, would have given Daddieco far more credibility than now appears on the face of the transcript. That is the precise result that Mr. Bailey intended to avoid. See note 5, *supra.*

In view of the entire record, it cannot be said that the evidence which the defendant claims to have been exculpatory and material was capable of creating a reasonable doubt no matter how it was used. Therefore, disclosure of this information was not required, and there is no reason in justice to reverse the convictions on this basis.

---

it is an inaccurate second-guess to state that Mr. Bailey would have used the "information." Mr. Bailey was well aware of what that "information" would have cost in terms of his trial strategy, and, as he testified, he was most unwilling to pay that price.

### 3. *Jury charge.*

(a) Shortly after the defendant filed his motion for a new trial based on an alleged conflict of interest, he amended the motion to include a portion of the judge's charge to the jury as justification for a new trial. The judge reviewed his charge and concluded that, when read in its entirety, the charge did not require a reversal of the convictions. The judge noted that no objection or exception had been taken to his instruction; indeed, trial counsel stated that "the charge as a whole is superb." The judge also observed that the defendant had not previously asserted the alleged error despite numerous opportunities to have done so. See note 1, *supra.*

The portion of the charge that the defendant now complains of reads: "Now, since both of these indictments encompass the same acts, in all practicality, from the set of facts or evidence in this case, I charge you if you find Francis Salemme not guilty, you shall find him not guilty of both charges, both indictments; *if you find him guilty of one, you shall find him guilty of the other.*" Without dispute the italicized portion should not have been stated, but it is neither fair nor permissible to isolate those words and ignore the charge in its entirety. *Commonwealth* v. *Therrien*, 371 Mass. 203, 206 (1976). *Commonwealth* v. *Ramey*, 368 Mass. 109, 114 (1975).

The Commonwealth has argued that we should deem this issue waived and not consider it. See *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 229 (1973); *Commonwealth* v. *Harrington*, 379 Mass. 446, 449 (1980). The defendant counters with the claim that he could not raise this issue until his double jeopardy contention had been resolved in *Salemme* v. *Commonwealth*, 370 Mass. 421 (1976). The defendant's explanation does not carry the day on the question of waiver, but we review his claim to determine whether there has been a substantial likelihood of a miscarriage of justice or grave prejudice to the defendant and to preclude any surmise that our decision would have been different had we reached the issue.

The defendant argues that the instruction directed the jury to find the defendant guilty and relieved the Commonwealth of the burden of proving every essential element of the crimes charged beyond a reasonable doubt. We do not minimize the error of the statement, but neither do we exaggerate it. "In determining whether these statements denied [the defendant] due process, 'we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 690-691 (1976), and cases collected therein. Viewing the charge in this manner, we find no grave prejudice to the defendant or a substantial likelihood that a miscarriage of justice has occurred. Several other facts confirm our conclusion. The Commonwealth's case "had to stand or fall" upon the credibility of Daddieco whose testimony encompassed all the essential elements of both indictments. *Commonwealth* v. *Salemme*, 3 Mass. App. Ct. at 107. The defense recognized this to be the case; the trial transcript shows that the defendant never argued a failure in the proof of any of the elements of either crime charged and that the summation was almost entirely dedicated to Daddieco's credibility. Defense counsel expressed total satisfaction with the charge when the trial judge invited corrections. When we consider these facts in conjunction with the entire jury charge, we cannot say that the instructions either confused the jury or relieved the Commonwealth of proving guilt on both indictments beyond a reasonable doubt.

(b) While reviewing the claims that the defendant brought before us, we became aware of the possibility that the jury charge might contain an error not theretofore raised. In order to do justice to this defendant and avoid further piecemeal appellate review of his trial, we requested the parties to submit briefs on the issue of the correctness of the judge's instructions on reasonable doubt.[14] See *Com-*

---

[14] The instructions on reasonable doubt read: "What is reasonable doubt? It is a doubt left in your mind, after considering evidence, based upon reason, as the words say. The prosecution, the Commonwealth,

*monwealth* v. *Ferreira,* 373 Mass. 116, 129-130 (1977) ("We think these examples understated and tended to trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt. . . . [W]e think the better course is that all references to examples taken from the jurors' lives should be avoided . . . The degree of certainty required to convict is unique to the criminal law. We do not think that people customarily make private decisions according to this standard nor may it even be possible to do so. Indeed, we suspect that were this standard mandatory in private affairs the result would be massive inertia. Individuals may often have the luxury of undoing private mistakes; a verdict of guilty is frequently irrevocable"). In *Commonwealth* v. *Grace,* 376 Mass. 499

does not have to prove its case by 100 percent mathematical certainty. That is usually impossible in the usual conduct of human affairs. The prosecution, or the Commonwealth, must prove its case so there is a moral certainty in your mind, after you have heard all of the evidence, that the defendant is guilty. The Commonwealth must prove its case so that you as reasonable men and women have an abiding conviction, a settled conclusion, of guilt of the defendant in your mind after you have considered all of the evidence. Reasonable doubt does not mean a whimsical or fanciful doubt, nor the lingering doubt we have in our minds when we have made an important decision in our daily lives, a decision we have reached after full and deliberate consideration of all the facts so we are morally certain we are doing the right thing. Let me give you an example. Suppose a man were moving his family from Boston to California, to the West coast. In doing so, he is changing his job, he is changing the location where his family will live, he is making such a change that will affect his income, his mode of living, the climate he lives in, where his family lives, the schools his children will attend, and even the recreation he may enjoy. That man could well fly to California, look over the situation, look at a house out there, look at the schools, be interviewed by his new employer, look over his new job. He then may consult with his father, his brother, some close friends, get their judgment on it, their advice. Then, after that man had weighed all of the considerations, decided, 'Yes, I will move my family to California,' there might be some lingering doubt always in his mind after he had moved that perhaps he shouldn't have, perhaps he made the wrong decision. But that is not the kind of reasonable doubt we are talking about, because that man has explored every avenue, every possibility of why he should not move there — or every reason, I should say, why he should not move there, and none of those reasons seemed important to him, or of very little importance. So, as I said to you, reasonable doubt must be based upon reason."

(1978), a defendant was denied relief from a Ferreira charge, and after the court's holding in *Commonwealth* v. *Garcia*, 379 Mass. 422, 441 (1980) ("We believe that *In re Winship*, 397 U.S. 358 [1970], made retroactive by *Ivan V.* v. *New York*, 407 U.S. 203 [1972], mandates retroactive application of *Ferreira*"), he sought Federal review of the propriety of the court's denial of relief in his case. See *Grace* v. *Butterworth*, No. 79-1422, Memorandum and Order (1st Cir., July 23, 1980); *Commonwealth* v. *Grace*, 381 Mass. 753 (1980) (*Grace II*); *Grace* v. *Butterworth*, 635 F.2d 1 (1st Cir. 1980). We awaited the outcome of this complex litigation on the chance that there might be some change in the standard of review to be applied to a "pre-*Ferreira*" jury charge on reasonable doubt employing an example of an event in the life of a hypothetical person.

*Grace II* does not stand for the proposition that such a jury charge is error per se requiring reversal of the conviction. The question for resolution has always been, and it continues to be, whether the jury charge in any way "'understated and tended to trivialize' the jury's duty to determine whether guilt was proved beyond a reasonable doubt." *Commonwealth* v. *Grace*, 381 Mass. at 736. If such error has occurred, it then becomes necessary to consider those factors collected in that opinion to determine if the conviction must be set aside.

There was no error in the instant instruction on reasonable doubt. *Ferreira* holds that examples taken from jurors' lives should be avoided because those decisions used as examples may not be arrived at with "the degree of certainty required to convict." 373 Mass. at 130. A given example might not constitute a major or important decision to all, and a doubt considered whimsical or fanciful by some might be considered reasonable by others. Those pitfalls did not exist in the present charge. To begin with, the judge did not rely upon random personal examples from the lives of the jurors. Instead, he created a hypothetical person who was about to make a decision regarded by him as major or critical. The judge described a specific situation wherein

his subject explored every reasonable avenue of resolution and presumably received acceptable answers to his inquiries before making his decision.[15] The hypothetical was constructed in such fashion that any doubts which that person might have entertained after completion of his decision making process would have been whimsical or fanciful and would not have risen to the level of reasonable doubt. Moreover, the judge repeatedly instructed the jurors that the Commonwealth had to prove its case to a moral certainty in their minds.

While the use of hypotheticals, analogies or examples from everyday life are viewed with strong disfavor, we cannot say that the judge's carefully constructed hypothetical so deviated from the classic formulation on reasonable doubt and moral certainty (see *Commonwealth* v. *Webster*, 5 Cush. 295, 320 [1850]) as to require a new trial.

Even assuming that because of the use of the hypothetical the charge was tainted by a *Ferreira* defect, we would still conclude that the defendant is not entitled to a new trial. Although "[t]he reasonable doubt standard is most crucial in cases where central facts . . . are at issue, and credibility plays a key role," *Garcia*, 379 Mass. at 441, the charge must nonetheless be considered in its entirety. Viewing it as a whole, we find an absence of any serious deficiency. The jurors were told numerous times that the Commonwealth was required to prove the defendant's guilt beyond a reasonable doubt and to a moral certainty. In its entirety, the charge properly conveyed the concept of reasonable doubt to the jury without distorting or shifting the Commonwealth's burden of proof. Compare *Dunn* v. *Perrin*, 570 F.2d 21, 23-24 (1st. Cir.), cert. denied, 437 U.S. 910 (1978); *Commonwealth* v. *Wood*, 380 Mass. 545, 548-549 (1980); see *Commonwealth* v. *Robinson*, 382 Mass. 189, 197-198 (1981). The defendant has always been represented by skilled coun-

[15] While the judge did not elaborate upon the answers the hypothetical subject received in response to his inquiries, it is implicit in the example that they were satisfactory.

sel.   Throughout his numerous postconviction proceedings he has made only one limited attack on the charge; he has never challenged the sufficiency of the charge as it relates to reasonable doubt, notwithstanding his ample opportunities to have done so.   In sum, the Constitution does not require that the defendant receive a new trial, and he has failed to show either grave prejudice or a substantial likelihood that a miscarriage of justice has occurred.   *Grace II*, 381 Mass. at 758-759.

> *Orders denying motions for*
> *new trial affirmed.*