> COMMONWEALTH *vs.* FRANK GOLDMAN.

Suffolk.    October 14, 1981. — December 3, 1981.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Practice, Criminal,* Assistance of counsel, Defendant's competency to stand trial. *Attorney at Law,* Conflict of interest.

The defendant at a criminal trial failed to show a conflict of interest on the part of his lawyer, by reason of which the lawyer ignored a possible defense independent of and at variance with that of a codefendant, where the record on a motion for a new trial adequately supported the judge's findings that the defendant never revealed to either his own or the codefendant's counsel any information which would have suggested any separate defense and that a common defense was expressly approved by both defendants after a discussion of available options. [704-707]
At the hearing on a motion for a new trial, evidence of a criminal defendant's "erratic" behavior in the courtroom during his trial, when considered with other evidence demonstrating that the defendant participated actively and intelligently in preparing his defense, was not such as to warrant a conclusion that the trial judge should have halted the proceedings to allow an independent assessment of his competency to stand trial. [707-709]

AMENDED MOTION for a new trial filed in the Superior Court Department on February 26, 1980.

The proceeding was heard by *Brogna, J.*

*Dean Richlin (Thomas F. Reilly* with him) for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for the Commonwealth.

GREANEY, J.   On October 6, 1977, in *Commonwealth v. Goldman,* 5 Mass. App. Ct. 635 (1977), we affirmed Goldman's convictions of robbery while armed and masked and attempted kidnapping.   On February 26, 1980, Goldman moved for a new trial on the grounds (1) that he was denied

effective assistance of counsel due to a conflict of interest on the part of his trial attorney, and (2) that he was denied a fair trial because the trial judge failed to hold a hearing sua sponte on his competency to continue with the proceedings. Because the trial judge was retired from judicial service at the time the motion was filed, the matter was referred to another judge who held a hearing, made written findings, and denied the motion. We affirm.

We first review the Commonwealth's evidence at trial. On April 12, 1976, the victim, a young woman, was walking through an alley in Revere when she was accosted by two masked men. One man took her handbag and ran off. The second man struggled with her and threatened her with a revolver in an unsuccessful attempt to remove a ring from one of her fingers. A third man then appeared and attempted to force her into an automobile parked at the end of the alley. When the victim's outcries and resistance frustrated these attempts, the two remaining men fled in the car. There was testimony that one of the assailants was wearing an army-type jacket and dark gloves. About ten minutes later, Malden police officers, who had received a description of the car used in the robbery, spotted a vehicle fitting that description and immediately gave chase. The car was stopped in the yard of the Balcom Electric Company with the police in pursuit. Two men jumped out, one from the driver's side, the other (later identified as Goldman) from the passenger's side. An employee of the company heard the commotion in the yard and looked out the window. She observed a man (Goldman) scramble from the passenger side of the car, run to an area containing some pipes, duck behind the pipes, and then emerge and run to a fence, only to be arrested at gunpoint as he started to climb the fence. He was wearing an army fatigue jacket and dark gloves. The police later retrieved a fully loaded revolver from behind the pipes where Goldman had ducked. The second man, Ralph DeLeo, was found hiding behind a shed in the yard. The employee of the company identified Goldman and DeLeo at trial as the two men she had seen leaving

the automobile. A search of the get-away car uncovered a loaded handgun on the front seat. A face mask, a red nylon jacket, and a wig were discovered elsewhere in the vehicle. The victim identified these articles as being worn by her assailants. The victim's handbag was later found discarded by the side of the road about 300 yards from the entrance to the electric company's property.

We next summarize the facts relevant to the conflict claim, drawing our summary from the judge's findings of fact with some minor supplementation from the evidence presented at the motion hearing.

At trial, Goldman was represented by Mr. Gerald Alch and DeLeo was represented by Mr. William J. Cintolo. At that time, Messrs. Alch and Cintolo rented office space at 1 Center Plaza, Boston. The lawyers were not partners but were involved in a space sharing arrangement. Their respective practices were conducted under the name "Law Offices of Gerald Alch," with the names of Mr. Cintolo and any other lawyers in the office appearing beneath that caption on the door and on the stationery.[1] Occasionally two defendants charged with the same crimes would both seek to engage Mr. Alch or Mr. Cintolo to represent them. On some of those occasions, the lawyer consulted first would refer one of the defendants to the other lawyer for possible representation. The Goldman-DeLeo cases became an example of this arrangement. Apart from these instances, the two lawyers conducted their practices separately.

Mr. Cintolo was apparently the first lawyer from the office to see DeLeo and Goldman when both defendants were being held at the Charles Street jail. Goldman explained to Mr. Cintolo that he had attempted unsuccessfully to retain Mr. Joseph S. Oteri to represent him and that Mr. Jack I. Zalkind had represented him only at a bail hearing. He

---

[1] A third defendant, Anthony Chiodi, who was apprehended later, charged with the robbery, and tried, convicted, and sentenced together with Goldman and DeLeo, was represented by another lawyer who was not associated with Mr. Alch or Mr. Cintolo.

asked Mr. Cintolo to obtain counsel for him. On the next visit to the jail, Mr. Alch accompanied Mr. Cintolo. It was thereafter agreed at a joint meeting between the two defendants and the two lawyers that Mr. Alch would represent Goldman and Mr. Cintolo would represent DeLeo. [2]

At preliminary meetings, Goldman told both lawyers that he had a serious drug problem and that he had difficulty remembering what occurred on the day of the crimes because he was under the influence of drugs. Mr. Alch apparently did not consider this information of any particular significance, nor did the information create any doubt in his mind about Goldman's competence to assist in preparation of the case. [3] At one point, Goldman furnished Mr. Alch with the names of witnesses whose anticipated testimony would have placed Goldman at a Boston restaurant at a time on April 12 which would have made it virtually impossible for him to have participated in the crimes. DeLeo also supplied Mr. Cintolo with the names of possible witnesses who would provide a similar alibi for his whereabouts on April 12. The lawyers or their investigator interviewed the prospective witnesses. Based on those interviews, however, they thereafter advised both Goldman and DeLeo that it would not be in their "best interests" to call the alibi witnesses at trial.

Prior to trial, with the plan for the defense in this posture, Goldman related to Mr. Alch the following version of how he and DeLeo came to be arrested together. Goldman said

---

[2] It appears that Goldman's wife paid her husband's fee to Mr. Alch and that she also paid a portion of DeLeo's fee to Mr. Cintolo. Appellate counsel for Goldman does not attach any significance to these facts.

[3] Shortly prior to trial, Mr. Alch had a doctor examine Goldman. The report of the examining physician was made an exhibit at the motion hearing, but it does not appear in the record. From uncontradicted testimony about the report, we are able to tell that the report was received on the day the trial started, that it found Goldman competent to stand trial even though he was a drug dependent person who would benefit from treatment, and that it repeated Goldman's assertions that it was only after his head cleared that he learned that he was not in the area at the time the crimes occurred, but rather was elsewhere with DeLeo.

that he had planned to meet DeLeo for the purpose of seeing an attorney; that after they met, they proceeded to walk towards the lawyer's office; and that their route to the lawyer's office took them by the Balcom Electric Company. As they approached the company, they heard a siren and saw an automobile coming their way at a high rate of speed with police vehicles giving chase. They backed away from the car as it came toward them. The car came to a sudden stop near Balcom Electric and two men jumped from it brandishing weapons. This caused the defendants to fear for their safety, and they then hid in the Balcom Electric lot. They saw the two men who jumped out of the car run away in the direction of railroad tracks nearby, and the next thing they knew they were being arrested.

A conference followed as to how these facts could best be presented to the jury. This was necessitated by the fact that both Goldman and DeLeo had serious criminal records which were certain to be revealed if they testified and which might damage their cases considerably. It was agreed by both defendants and their lawyers that DeLeo would make the more articulate witness. He was therefore chosen as the one to present what had been settled upon as a common defense. The foregoing trial strategy was planned at several meetings attended by both defendants and both lawyers, at which there was no discussion of any possible conflict of interest by Mr. Alch nor any mention by Goldman that he might have a defense which differed from the common strategy. DeLeo testified substantially as agreed upon.

We come now to Goldman's testimony at the hearing on his motion for a new trial. He testified that DeLeo called him at home on the morning of April 12 and told him that he would pick him up so that they both could see a lawyer; that he, Goldman, was considerably under the influence of drugs and alcohol consumed the previous evening and that day; that he remembered getting into a car with DeLeo; that the car stopped somewhere (he did not know where); that DeLeo got out of the car but he remained in the vehicle;

that he may have been in the car while DeLeo and Chiodi were robbing the victim but he did not get out and participate in the robbery; that DeLeo jumped back in the car and drove off at high speed; and that the next thing he remembered was his arrest by the police. Goldman further testified that he had informed his lawyer of all these facts but that Mr. Alch had ignored this information because of DeLeo's insistence that they both proceed to trial on a unified defense. For corroboration, Goldman presented his wife[4] and Mr. Zalkind.[5]

The judge expressly found, however, that Goldman never told either Mr. Alch or Mr. Cintolo that he had remained in the automobile after being picked up by DeLeo or that he had not participated in the crimes. Based on this finding, the judge also found that once it was decided that the alibi defenses were not practical, both Goldman and DeLeo agreed that DeLeo would present their common defense of accidental presence. In these circumstances, the judge perceived no actual conflict on Mr. Alch's part, nor any necessity for Mr. Alch to advise Goldman of any potential for conflict.

1. *The conflict of interest question.* Goldman's claims of conflict rest on the testimony at the motion hearing that he was present at the scene but remained in the car oblivious to the robbery because of a drug-induced stupor. In his view, these facts negated the state of mind necessary to establish his participation in the crimes and provided a defense which was independent of, and at variance with, DeLeo's story. He claims that both Messrs. Alch and Cintolo ignored this

---

[4] Both Goldman and his wife testified that they had not disclosed the account stated at the motion hearing during the four years following the incident because of threats made against them by DeLeo.

[5] The judge found that Goldman "may have" related to Mr. Zalkind a story similar to the one which he told at the motion hearing. Mr. Zalkind testified that he represented Goldman in connection with bail, that he could not remember exactly what Goldman had said about his involvement in the crimes, except that he had admitted being present at the scene of the robbery with two other men, and that he discussed nothing more than Goldman's representation at the preliminary bail hearing.

defense in order to pursue the common defense, which was contrived by DeLeo and which operated primarily to DeLeo's benefit. As further support for this argument, Goldman points to his lawyer's apparent disregard of his erratic behavior at trial (discussed in part 2, *infra*) and, Mr. Alch's decision that DeLeo should testify for both of them. Goldman sees these decisions as calculated to suppress his separate defense in order to protect DeLeo. Thus, he concludes that an actual conflict existed by reason of which his lawyer concurrently represented both his interests and DeLeo's and allowed DeLeo's interests to predominate.

Goldman's theory is sophisticated enough in the abstract, but breaks down, in our view, on the judge's finding that Goldman never revealed to either counsel any information of the sort which he disclosed at the motion hearing. The judge found that the only relevant information which Goldman conveyed to Messrs. Alch and Cintolo prior to his attempt to construct an alibi was the fact that "he was so confused because of drugs or other things that he did not remember participating in the crime[s] with DeLeo." He did not tell either lawyer that he had never left the car because of a drug-induced stupor. In our view, the information which Goldman provided counsel in the preliminary meetings would not have warranted a defense of lack of responsibility or a defense based on voluntary drug use vitiating the intent element of the crimes. See *Commonwealth v. Sheehan*, 376 Mass. 765, 772-775 (1978).

We think that Mr. Alch did essentially what would be expected of a competent criminal lawyer with the information he did receive: he decided that an examination for competence would be appropriate prior to trial,[6] and he proceeded to explore other theories of defense. The latter led to infor-

---

[6] Goldman was examined again after the verdicts and prior to sentencing and found by a physician to be a drug dependent person who would benefit from treatment. That fact was called to the trial judge's attention by Mr. Alch in the course of his sentencing argument. See G. L. c. 123, § 48, as amended by St. 1974, c. 827, §§ 18, 19; Smith, Criminal Practice and Procedure § 1476 (Supp. 1979).

mation from Goldman about a possible alibi which was investigated and which would have constituted a defense had it been tenable. Since it apparently was not, and since there were, in any event, eye-witnesses who would establish Goldman's active participation in the crimes, the recommendation of a unified defense was reasonable. We think it unreasonable to suggest that the information then supplied by Goldman should have led Mr. Alch to perceive the elaborate defense now articulated by him for the first time nearly four years following the verdicts.[7] This is particularly so since both the alibi claim and the claim that the defendant was present in the company yard by accident were inconsistent on their facts with the defense now urged.

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance" (emphasis supplied). *Cuyler* v. *Sullivan*, 446 U.S. 335, 348 (1980). "Our own cases are clear on the point that the defendant in this case had the burden of proving, without resort to speculation, both the existence and the precise character of an actual conflict of interest. See, e.g., *Commonwealth* v. *Adams*, 374 Mass. 722, 731 (1978); *Commonwealth* v. *Bolduc*, 375 Mass. 530, 541 (1978); *Commonwealth* v. *Wright*, 376 Mass. 725, 732 (1978); *Commonwealth* v. *Davis*, 376 Mass. 777, 781 (1978); *Commonwealth* v. *Soffen*, 377 Mass. 433, 436-437 (1979)." *Commonwealth* v. *Leo*, 11 Mass. App. Ct. 283, 285 (1981). Here, the judge made detailed findings of fact, and the dispositive findings are adequately supported by the evidence. See *Commonwealth* v. *Moon*, 380 Mass. 751, 755-756 (1980). We find nothing in the findings to support

---

[7] Goldman's alternative position is that his statements regarding his drug use should have led Mr. Alch to talk to Mr. Zalkind, who would have supplied information in sufficient detail to alert Mr. Alch of the existence of the so called separate defense. However, based on Mr. Zalkind's testimony that his representation was confined to bail matters and that he could remember little of what Goldman told him, we see no merit in this alternative argument.

the notion that Goldman's lawyer gave him anything less than his undivided attention before or during the trial, or that his lawyer's loyalty was impaired by the presentation of the common defense. Rather, the record adequately supports the judge's conclusion that the common defense was expressly approved by both defendants, after discussion of available options, as virtually their only hope against a strong government case.[8]

2. *The competency question.* The trial lasted seven court days. On the fourth or fifth day, it was brought to the trial judge's attention that Goldman was behaving "erratically" in the courtroom. The judge received information from the court officers that Goldman's wife, in the course of embracing and kissing him during recesses, might have been supplying him with contraband. The judge met with counsel and entered an order prohibiting Goldman from having physical contact with his wife for the remainder of the trial. Goldman now argues that the judge should have construed these facts as raising a substantial doubt about his competence to continue the trial and that the judge erred in failing to stop the trial and order an immediate examination for competency.

At the motion hearing on this issue, Goldman testified that he was under the influence of drugs throughout the trial. Mr. Cintolo testified that on at least one occasion Goldman made "masonic signs" to the jury. In addition he

---

[8] Our conclusion that Mr. Alch was not aware of another alternative strategy renders it unnecessary to discuss Goldman's contention that there existed a conflict which resulted in material prejudice. See generally *Commonwealth* v. *Davis*, 376 Mass. 777, 783 (1978); *Commonwealth* v. *Salemme*, 11 Mass. App. Ct. 208, 214 (1981). Likewise, there is nothing in Supreme Judicial Court Rule: 322, DR 5-105, 359 Mass. 816 (1972), now as appearing in S.J.C. Rule 3:07, 382 Mass. 768 (1981), which would alter the result in this case. See also S.J.C. Rule 3:08, Standards Relating to Defense Function, DF6, 382 Mass. 804 (1981), originally promulgated as S.J.C. Rule 3:22A, 377 Mass. 929 (1979), which regulates the matter of lawyers involved in group practice representing more than one defendant in the same criminal case. See also the discussion of the subject, with prophylactic suggestions, in *United States* v. *Garafola*, 428 F.Supp. 620 (D.N.J. 1977), in particular the discussion at 627 and Appendix A at 628.

produced testimony by his wife that she had given him rather unusual mouth-to-mouth resuscitation; testimony by a correction officer from the State prison where he was received after sentencing that he manifested signs of drug use when he arrived at the prison; and testimony by counsel for the defendant Chiodi that Goldman acted in an erratic fashion before and during the trial. The motion judge found that the trial judge's failure to make a sua sponte order for examination of the defendant's competence did not deprive Goldman of any due process right.

The test of a defendant's competence to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky* v. *United States*, 362 U.S. 402, 402 (1960). *Commonwealth* v. *Kostka*, 370 Mass. 516, 522 (1976). *Commonwealth* v. *Hill*, 375 Mass. 50, 52, 54 (1978). If circumstances known to a trial judge raise "a substantial question of possible doubt" (*Rhay* v. *White*, 385 F.2d 883, 886 [9th Cir. 1967]) about a defendant's competence to proceed to trial, it becomes the judge's duty to conduct a hearing on the issue on his own initiative. See *Pate* v. *Robinson*, 383 U.S. 375, 385-386 (1966). However, the display of a "few mannerisms which are consistent with no more than nervousness, diffidence, boredom or dissembling" are not of themselves sufficient to require an inquiry. *Commonwealth* v. *Vailes*, 360 Mass. 522, 525 (1971).

We believe the lack of any motion or request for an examination by Goldman's trial counsel is of significance, particularly since counsel had received a medical report at the commencement of trial which stated that Goldman was competent. Likewise, weight must be afforded to the trial judge's first-hand opportunity to observe the defendant throughout the trial, and his implicit judgment that neither the behavior reported nor Goldman's appearance was indicative of incompetence. Moreover, the evidence at the motion hearing demonstrates that Goldman participated

actively and intelligently in preparing his defense, that his lawyer saw nothing which would call into question his competence to do so, even to the point of testifying, if necessary, and that he ultimately had an adequate recollection of the events of April 12. This evidence supports the motion judge's finding that the trial judge was not obliged, based on the meager facts reported, to halt the proceedings for an independent assessment of Goldman's mental capacity. In our view, this case is not comparable to the situation in *Commonwealth v. Rise*, 7 Mass. App. Ct. 106, 106-108 (1979), where substantial psychiatric or psychological evidence of potential incompetence was present and left unresolved by the day of the trial. It is also distinguishable from cases holding that an evidentiary hearing was required "because of evidence in those cases of the defendant's violent or extremely irrational conduct in the court room . . . or the defendant's long and emphatic history of mental incompetence." *Commonwealth v. Vailes*, 360 Mass. at 525, and see cases cited. Contrast *Commonwealth v. Hill*, 375 Mass. at 55-57. We conclude that the evidence warranted the conclusions on the issue reached by the motion judge and that he properly rejected this ground of the motion for a new trial.

> *Order denying motion for new trial affirmed.*