COMMONWEALTH *vs.* DANIEL K. FERREIRA.

Bristol.    May 2, 1977. — July 22, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Homicide.    Practice, Criminal,* Charge to jury.    *Evidence,* Redirect examination.    *Words,* "Reasonable doubt."

At the trial of an indictment for murder in the first degree, where evidence of the defendant's guilt was not overwhelming, it was reversible error to instruct the jury as to the sentencing and parole consequences of murder in the first and second degrees. [123-128]

---

At a murder trial, the judge erred in his instructions to the jury on the standard of reasonable doubt. [128-130]

At the trial of one of two men charged with murder, it was prejudicial to the defendant to exclude his explanation as to why he did not give a statement to the police where the prosecutor had elicited testimony on cross-examination that, when the second man had accused him of the murder at a police station, the defendant had replied, "Is that right, Joe?" [130-131]

INDICTMENT found and returned in the Superior Court on August 13, 1973.

The case was tried before *Brogna, J.*

*Susan J. Baronoff* for the defendant.

*Lance J. Garth,* Assistant District Attorney (*Mary Alice McLaughlin,* Special Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J.   The defendant, Daniel K. Ferreira, brings this appeal pursuant to G. L. c. 278, §§ 33A-33G, from his conviction of the murder in the first degree of Fall River police Officer John Ruggiero on July 23, 1973. He raises three issues in this appeal: (1) whether it was reversible error for the trial judge to charge the jury as to the sentencing and parole consequences for murder in the first and second degrees; (2) whether the trial judge erred in charging the jury that the reasonable doubt standard required that they be convinced of the defendant's guilt to the same degree of certainty they would have used in making important economic or social decisions in their own lives; (3) whether the trial judge erred in preventing the defendant from explaining why he did not give a statement to the police. We conclude that there was error, and we reverse.

The evidence in this case is highly material to our conclusions herein, especially as it relates to the Commonwealth's claim of harmless error. In particular, the record shows that the case against the defendant was not so overwhelming as to exclude logical argument that one Joseph Silva, not the defendant, committed the homicide. So also, with regard to the judge's disputed instructions as to the

punishments for murder in the first and second degrees, the evidence in its entirety did not make out an overwhelming case of murder in the first degree. Accordingly, we summarize the evidence in some detail.

*Testimony of Officer Fortin.* The circumstances of Officer Ruggiero's death were described at trial by Fall River police Officer Robert Fortin, an eyewitness. Fortin testified that as he was walking his beat at approximately 3:20 A.M. he observed Ruggiero in his cruiser following a black Cadillac automobile which had no lights on. The Cadillac stopped in the middle of the street, the cruiser came to a stop behind it, and the Cadillac then pulled partially into an adjacent parking lot. Fortin was approximately 210 feet away at this point.

Two men ran from the car toward Ruggiero's cruiser. The shorter of the two men, later identified as the defendant, wearing a dark shirt, ran to within four inches of the cruiser, to a point even with the rear view mirror outside Ruggiero's window. The taller man, later identified as Joseph Silva, who was wearing a white shirt or jacket, also ran to a point near Ruggiero's window about one and one-half feet behind and to the right of the other man, at a point approximately even with the division between the driver's window and the rear window. Fortin heard four or five gunshots and saw flashes beginning about four inches from the window. He could not tell which man fired the shots.

Both men then ran back to the Cadillac and sped toward Fortin. When the car was ten to fifteen feet away from him, Fortin recognized the driver as Joseph Silva and the passenger as the defendant.[1] He saw the defendant pointing a gun out the window at him as the car sped past. Fortin then fired several shots at the rear of the Cadillac, following which he radioed to other officers to apprehend Silva and the defendant for the shooting of Officer Ruggiero.

*The arrest of the defendant.* Officers Lawrence Fer-

---

[1] Fortin had known both men for years and had seen them often.

reira,[2] William Lake and Gerald Souza testified that about 3:30 A.M. they heard broken radio messages that Officer Ruggiero had been shot and that the Cadillac involved was heading west on a named street; however, they did not recall the suspects' names being mentioned in the broadcast. All three officers were in the vicinity in separate cruisers, and each gave chase but could not keep pace with the Cadillac. The Cadillac, with bullet holes in the rear, was found a short time later parked at an intersection. Lake and Souza, who were the first to arrive at the intersection, did not see anyone get out of the car but found the defendant lying in some tall grass near a fence, four to five feet away from the open passenger's door. He was wearing tight shorts and a dark pullover shirt. The officers apprehended him, although he twice attempted to escape, sustaining a head wound in the process. About eight feet from the spot where the defendant was lying, Lake found a gun which he guarded until Detective-Sergeant Lawrence M. Ferreira retrieved it.

Officer Ferreira stated that, once the defendant had been placed in a cruiser and advised of his Miranda rights, the defendant said, "You know who I am. What's this all about?" Detective Paul Carey, who arrived at the scene with Detective Francis McDonald and read the defendant his Miranda rights, testified that the defendant told him that he knew his rights and that Silva was across the street. Detective Carey added that the defendant asked him not to tell Silva that he disclosed where he was and to forget that he had been given his rights. About 5 A.M. Carey and McDonald entered the house across the street, found Silva in bed, and took him to the station for questioning.

*The physical evidence.* Detective-Sergeant Ferreira identified the gun that he recovered near the Cadillac as a

---

[2] To avoid possible confusion of names, we note the fact that there are three persons named Ferreira involved in this case: Daniel K. Ferreira, the defendant, Officer Lawrence Ferreira, and Detective-Sergeant Lawrence M. Ferreira.

.38 caliber weapon made by the Charter Arms Company. He took it to the police station, where it was transmitted to State police Sergeant Arthur Turcotte. Sergeant Turcotte testified that between 3:30 and 4 A.M. on July 23, 1973, he examined both the gun and the five cartridge cases inside for latent prints, but found none.

Detective Edward Pedro testified that no paraffin test was performed on the defendant or Silva because the test is unreliable and no one in the Fall River police department was qualified to give it. He denied that the defendant asked for a test on his hands, but said that the defendant had requested that the gun be checked for fingerprints. Pedro also testified that he questioned Silva at the police station and that Silva mentioned a box of bullets, which the witness obtained from one Margaret Strickland at the address at which Silva had been arrested.

State police Officer George Windisch testified that he examined the Charter Arms gun, three projectiles recovered from the victim's cruiser, a projectile removed from the victim's right eye socket area, a fragment taken from the victim's left hand, and the box of bullets that Detective Pedro took from Silva's apartment. After conducting various tests, Windisch concluded that three of the projectiles had been fired from the Charter Arms gun, the other items being too badly damaged to permit any conclusion, and that the stippling patterns around two of the victim's wounds indicated that the gun had been fired at a range of three feet or less. He could not tell whether the ammunition used in the Charter Arms gun had been taken from the box of bullets found at Silva's apartment, although the gun and the bullets in the box were both .38 caliber and the five cartridge cases remaining in the gun resembled the cartridge cases in the box.

*The testimony of Silva and Margaret Strickland.* Joseph Silva, who was also under indictment for Ruggiero's murder, testified for the Commonwealth. He stated that he met the defendant, a friend of his for about a year, at 10:30 A.M. on July 22, 1973. They toured various Fall River establishments until one o'clock the next morning,

drinking heavily and eating occasionally. After 1 A.M. they
visited the homes of several friends and continued drink-
ing.

Silva testified that, after leaving the last of the homes
they visited, he and the defendant were driving about
3 A.M. when he saw a police cruiser following him. He made
a right turn and pulled into a parking lot. On direct exam-
ination, Silva claimed that he entered the parking lot at
the defendant's direction. However, on cross-examination,
he admitted that he stopped on his own initiative, know-
ing that he and the defendant had been drinking heavily,
fearing that he was suspected of "driving under the influ-
ence," and intending to explain that he had stopped to see
a girl. Silva said that he did not recall driving without
lights.

According to Silva, after he stopped the car, the defend-
ant walked over to the cruiser and he followed. The de-
fendant pulled out a revolver and fired several times point-
blank at the officer. At this time, the defendant was at the
officer's front door, and Silva was to his right, four to five
feet away from the cruiser. After the shooting, Silva ran
with the defendant to the car, and the chase described by
the police officers ensued. Silva did not recall whether he
was wearing his white jacket at the time of the shooting.[3]

Silva further testified that, when he arrived in front of
his house, he jumped out of the car and ran upstairs.
While he waited for the police, he talked to Margaret
Strickland about what happened. About 5:30 A.M. several
officers came to his apartment and took him to the police
station for questioning.

On cross-examination, Silva testified that the defendant
dropped the box of bullets recovered from his apartment
while he was visiting Silva some months previously.

Margaret Strickland, the woman who lived with Silva,
corroborated the police version of the defendant's arrest
and Silva's testimony that the defendant had left a box of

---

[3] A white jacket was found in the back seat of the Cadillac when the
police arrived at the scene.

bullets at their apartment. She also testified that she did not see Silva get out of his car and that Silva went to bed heavily drunk, but he talked with her instead of sleeping until the police came.

*The defendant's testimony.* The defendant testified that he met Silva at 10:30 A.M. on July 22, 1973, and that they drank heavily through the day and evening at various establishments. After the bars closed, they visited the homes of several friends at which they continued to drink. The defendant then asked to be taken home.

The defendant further testified that, as Silva was driving the Cadillac, the defendant was vomiting out the window and did not notice if Silva had the car lights on. Silva remarked, "We're being followed by a cop," turned onto Boutwell Street, and pulled into a parking lot. Saying, "I'll fix him," Silva grabbed a gun from under the front seat and headed toward the cruiser. The defendant ran to within one foot of the cruiser to warn the officer that Silva had a gun, but by this time Silva was firing at the victim from a range of less than four feet.[4] The defendant did not know the victim or why Silva shot him.

The defendant explained that he fled the scene with Silva because he had a police record. As they sped away, the defendant vomited out the window again,[5] and did not see Officer Fortin, whom he knew, nor did he point a gun at him. He asked to be let out of the car, but Silva drove to the intersection where the car was found and pushed the defendant out of the car. He then recounted his arrest substantially as it had been testified to by the police officers.

The defendant stated that although he had not seen Silva with a gun earlier that day, he noticed a gun and a box of ammunition in Silva's pantry around Christmas, 1972. Silva later told him that he had bought the gun from a person who was in jail.

---

[4] The defendant testified that Silva was wearing a black shirt at the time of the shooting, having earlier taken off his white jacket.

[5] Detective McDonald testified in rebuttal that he noticed no vomit in the Cadillac.

The defendant also testified about statements he made to the police, or in their presence. On direct examination, he testified that after he was apprehended, he was asked where the owner of the Cadillac was and disclosed that Silva was on the third floor of the house across the street.[6] He further testified that he requested Detective Pedro have the gun and his hands checked, but that no tests were run on his hands. On cross-examination, the Commonwealth elicited that, after the defendant had been advised of his rights at the police station, Silva came into the station and accused him of killing Officer Ruggiero. The defendant responded, "Is that right, Joe?" On redirect examination, the defendant was asked by his counsel to explain why he did not give the police a statement at the station, but this question was excluded and counsel excepted.[7]

*Other defense witnesses.* Diane Carrita, the woman who lived with the defendant, testified that she had accompanied the defendant to Silva's apartment on the day on which Silva testified that the defendant had left the box of bullets there, but said that she had not seen the defendant ever bring bullets there.

Theodore Souza testified that he was the owner of the Charter Arms .38 caliber gun. He stated that he knew both the defendant and Silva, but gave neither of them the gun. He agreed that he might have left it at the service station he owned on Pleasant Street, which both the defendant and Silva frequented.

1. *The Charge.*

The judge charged the jury in substance that, if they found the defendant guilty of murder in the first degree, he would be sentenced to life imprisonment without eligi-

---

[6] The defendant did not recall asking Detective Carey not to tell Silva that he told him where Silva was, or to forget that he had advised him of his rights.

[7] On cross-examination, the Commonwealth attempted to impeach the defendant by introducing his record of prior convictions. None of his prior convictions appears to have involved the use of firearms.

bility for parole, while if they found him guilty of murder in the second degree, he would also be sentenced to life imprisonment but would be eligible for parole after fifteen years,[8] and defense counsel excepted. This portion of the charge was error.[9]

We have long held that the sentencing consequences of a verdict may not be submitted to the jury because the jury's function is to reach a verdict based solely on the evidence presented to them considered in light of the judge's charge to them concerning the applicable legal standards. The degree of murder is for the jury to determine. G. L. c. 265, § 1. However, the jury's function in this respect is not to weigh possible verdicts with an eye toward dispensing mercy in certain cases or imposing heavier penalties in others. Rather, the jury's function is solely one of fact finding with respect to the legal standards regarding innocence or guilt. The jury has a duty to return a verdict of guilty of murder in the first degree only if they conclude that the evidence before them establishes beyond a reasonable doubt that the defendant committed a murder falling within one of the three statutory categories of murder in the first degree. Conversely, the jury have a duty to return a verdict of murder in the second degree only if they conclude that the evidence before them establishes beyond a reasonable doubt that the defendant committed a murder which was not proved beyond a reason-

---

[8] The judge's full charge on this point was as follows: "As I said before, there is one crime of murder; there are two degrees. They differ principally in the punishment. And because you, in effect, have to determine the degree of murder, effectively impose the punishment, I think it only fair that I tell you what the difference in the punishment is.

"A person convicted of first degree murder now, under recent Supreme Court decisions and agreed in this case, will be sentenced to life imprisonment without eligibility for parole. He spends the rest of his life in prison except if he is pardoned by the Governor and the Council.

"A person convicted of second degree murder is similarly sentenced to life imprisonment. He is eligible — I don't say he has to make it — but he is eligible for parole in fifteen years."

[9] The Commonwealth concedes in its brief that this portion of the charge was erroneous but argues that the error was harmless.

able doubt to be murder in the first degree. *Commonwealth v. Dickerson,* 372 Mass. 783 (1977).

If the jury could properly exercise a dispensing function, an argument might plausibly be made that they should be instructed as to the practical consequences of their verdicts. However, we firmly rejected that view in *Dickerson,* in reaching a result entirely consistent with our long-standing rule that sentencing and parole considerations are not matters within the jury's proper sphere.

"The principal argument for rejecting the practice of instructing juries as to the legal consequences of their verdicts in criminal cases seems to lie in the conviction that, in reaching their verdicts, jurors should be shielded from extraneous influences and should arrive at their verdicts only on a dispassionate consideration of the relevant and credible evidence presented to them in the adversary process. . . . To inform jurors of the consequences of their verdicts is apparently seen . . . as inviting result-oriented verdicts and possible deviation from the basic issues of a defendant's guilt or innocence. This process, if allowed without restriction, could lead to the jury's usurpation of the judge's sentencing prerogatives and duties and the Legislature's policy determining functions." *Commonwealth* v. *Mutina,* 366 Mass. 810, 817 (1975).

In *Mutina,* we reversed a conviction of murder in the first degree, holding that, for all trials and retrials after the date of that opinion, a defendant is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity if a timely request for such instruction is made. We stressed, however, that we did not depart from "the long-standing general rule that neither sentencing nor parole may appropriately be considered by the jury in reaching their verdict." We concluded that the jurors might well have based their verdict, not on the evidence, but on a desire to ensure the continued confinement of the defendant. Instructing the jury on the consequences of a verdict of not guilty by reason of insanity may, in an appropriate case, afford the same protection as does the application of the general rule that sentencing conse-

quences are not within the jury's province: it prevents extraneous factors from interfering with or even totally eclipsing the jury's deliberations with respect to the evidence before them.

"[U]nless otherwise provided by statute, the jury in this Commonwealth have no responsibility for, or authority to recommend, attempt to influence, or otherwise participate in any way in, the sentencing of a defendant whom they have found guilty. It necessarily follows that the jury have no right to determine the crime of which the defendant is guilty, or the degree thereof, on the basis of the penalty which they believe the defendant should or might receive." *Commonwealth* v. *Mutina, supra* at 824-825 (Quirico, J., concurring in part and dissenting in part). See *Commonwealth* v. *Goodwin,* 356 Mass. 632 (1970) ; *Commonwealth* v. *McNeil,* 328 Mass. 436 (1952).

The general rule is so well established that the only real question is whether there was reversible error here. We turn now to that issue.

In *Commonwealth* v. *Burnett,* 371 Mass. 13 (1976), we considered a charge similar to the one now before us. We stated in that case, at 16: "The trial judge is not to explain to the jury what parole conditions are for murder in the first degree or what they are if the defendant is found guilty of murder in the second degree. Such instructions tread closely to reversible error and are to be avoided." We concluded that the charge was not reversible error for three reasons. First, defense counsel did not except to that portion of the charge and, while we could consider the issue under our § 33E powers, when the error was not brought to the judge's attention, we would reverse only on a showing of "grave prejudice." Second, defense counsel had commented on sentencing in his closing argument, and the judge may have considered a curative instruction necessary. Third, the Commonwealth had presented a very strong case of murder in the first degree against the defendant.

None of these three factors is present in this case. Defense counsel took timely exception to the charge, arguing

that the charge enhanced the possibility that the jury would return a verdict of murder in the first degree because they might reasonably view the unprovoked murder of an on-duty police officer with particular revulsion and be guided in their deliberations by that revulsion rather than by the evidence before them.

The evidence here demonstrated clearly that a vicious and unprovoked murder was committed and that one of two men, the defendant or Silva, committed that murder.[10] While there was evidence from which the jury could have concluded that the defendant was guilty of murder in the first degree, we think that the question was not so free from doubt as to render the charge harmless beyond a reasonable doubt.

We have in this case a classic duel of credibility: Silva testified that the defendant fired the shots, and the defendant testified that Silva did the shooting. While the jury could have chosen to accept Silva's testimony rather than that of the defendant, Silva's testimony was hardly disinterested, as he was also under indictment for the murder at the time of the trial. The Commonwealth's other evidence did tend to favor the proposition that the defendant had fired the shots rather than Silva but cannot be said to have pointed decisively to the defendant.

Nor does the evidence in this case compel the conclusion that if the defendant did fire the shots he was guilty of murder in the first degree. There was extensive testimony that the two men had been drinking very heavily for a period of seventeen hours prior to the shooting. The judge quite properly charged the jury that, while intoxication would not excuse the crime of murder, if they found that the defendant had fired the shots, they might conclude that his degree of intoxication was such that he was incapable of forming the requisite deliberate premeditation to support a conviction of murder in the first degree. See *Commonwealth* v. *Taylor*, 263 Mass. 356, 363 (1928). The jury

---

[10] There was no evidence of joint enterprise, and the judge accordingly gave no instructions on the law thereof.

returned after three hours' deliberation to request that the judge clarify the distinction between murder in the first and second degrees. We are unable to conclude that the judge's charge on sentencing consequences did not have a prejudicial impact on the jury.

It can be argued that, as a result of the erroneous instructions as to sentencing, this court should order that the verdict as to murder in the first degree should be vacated and a verdict of guilty of murder in the second degree should be entered. G. L. c. 278, § 33E. See *Commonwealth* v. *Rego,* 360 Mass. 385, 393-397 (1971). The premise is persuasive that the impact of this aspect of the charge could be prejudicial only as to the degree of murder. The reasoning here is that the jury's verdict establishes conclusively that they decided that the defendant, rather than Silva, committed the murder, and that the erroneous instructions could not have affected their deliberations in reaching that conclusion.

We conclude, nevertheless, that the defendant is to have a new trial, rather than a reduction of the verdict to murder in the second degree. Any doubt we might have on this score is resolved by the judge's charge on reasonable doubt.[11] We consider this portion of the charge in light of the fact that, as emphasized *supra,* the evidence of the defendant's guilt was not overwhelming. We also consider that no part of the usual instructions to juries in criminal cases is of more significance than the discussion of reasonable doubt.

The judge charged the jury that "[y]ou must be as sure as you would have been any time in your own lives that you had to make important decisions affecting your own economic or social lives. You know, any time that you had to make an important decision, you couldn't be absolutely, mathematically sure that you were doing the right thing

---

[11] While defense counsel did not specifically except to this portion of the charge, we may properly consider the issue under our § 33E powers. *Commonwealth* v. *Burnett,* 371 Mass. 13 (1976). Viewing the charge in its entirety, we must conclude that there was grave prejudice to the defendant.

— you weigh the pros and cons; and unless you were reasonably sure beyond a reasonable doubt. . . ." He went on to give examples of these "important" decisions: "[W]hether to leave school or to get a job or to continue with your education, or to get married or stay single, or to stay married or get divorced, or to buy a house or continue to rent, or to pack up and leave the community where you were born and where your friends are, and go someplace else for what you hoped was a better job."

We think these examples understated and tended to trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt. We have previously criticized the type of analogy drawn here. See, e.g., *Commonwealth* v. *Fielding,* 371 Mass. 97, 116-117 (1976); *Commonwealth* v. *Gilday,* 367 Mass. 474, 497-498 (1975); *Commonwealth* v. *Coleman,* 366 Mass. 705, 712 (1975); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 12 (1974); *Commonwealth* v. *Bumpus,* 362 Mass. 672, 681-682 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974); *Commonwealth* v. *Libby,* 358 Mass. 617, 621 (1971). The charge now before us is notably bereft of the saving graces present in charges which we have previously criticized but found not to be reversible error when taken in their entirety.

In *Commonwealth* v. *Bumpus, supra* at 682, in which the sole example was a reference to the degree of certainty a juror would want in deciding whether to undergo major heart surgery, we stated: "The inherent difficulty in using such examples is that, while they may assist in explaining the seriousness of the decision before the jury, they may not be illustrative of the degree of certainty required." We think the examples used here, far from emphasizing the seriousness of the decision before them, detracted both from the seriousness of the decision and the Commonwealth's burden of proof.

Accordingly, we conclude that the judgment must be reversed. We think that there was reversible error both in the portion of the judge's charge dealing with sentencing

and parole consequences and in his charge on the reasonable doubt standard. While this charge goes unusually far afield, we think the better course is that all references to examples taken from the jurors' lives should be avoided. We have previously expressed this "wish." *Commonwealth v. Coleman,* 366 Mass. 705, 712 (1975). The degree of certainty required to convict is unique to the criminal law. We do not think that people customarily make private decisions according to this standard nor may it even be possible to do so. Indeed, we suspect that were this standard mandatory in private affairs the result would be massive inertia. Individuals may often have the luxury of undoing private mistakes; a verdict of guilty is frequently irrevocable.[12]

2. *Limitation of Redirect Examination.*

The defendant raises one further issue which we consider, since the issue may arise on retrial of this case. On cross-examination, the Commonwealth elicited testimony from the defendant that while he was in custody at the police station and after he had been advised of his Miranda rights, Silva, who was also in custody, accused the defendant of killing Officer Ruggiero, to which the defendant replied, "Is that right, Joe?" On redirect examination, defense counsel asked the defendant to explain why he gave no statement to the police. The question was excluded; defense counsel excepted, but made no offer of proof.

We think that if this case is retried, this evidence should be admitted, subject to the making of an appropriate offer of proof. The Commonwealth argues that since under *Doyle v. Ohio,* 426 U.S. 610 (1976), a defendant's silence during custodial interrogation is not competent or material

---

[12] We reiterate the admonition we expressed in *Commonwealth v. Therrien,* 371 Mass. 203, 209 (1976), quoting from *Commonwealth v. Gerald,* 356 Mass. 386, 390 (1969): "Explanation of 'reasonable doubt,' we think, is usually best made in close reliance on the time-tested language of *Commonwealth v. Webster,* 5 Cush. 295, 320 [1850]." It is fair to say that unimpeachable instructions as to reasonable doubt which we have reviewed in many other cases have invariably been based on the key phrases of *Webster,* as modified and unquestionably improved by some variations from the exact language of the *Webster* case.

evidence against him, and since the Commonwealth may not question a defendant on cross-examination about his refusal to give a statement to police in order to impeach his exculpatory trial testimony, the defendant here had no right to explain his silence.[13] However, the case now before us does not present a question of mere silence. The defendant's statement elicited by the Commonwealth was potentially quite damaging to the defendant's case, particularly since the case turned on a battle of credibility between the defendant and Silva, and in all probability it was in the forefront of the jurors' minds to wonder why the defendant did not tell the police that Silva had killed Officer Ruggiero when placed in an immediate confrontation with his accuser. The question asked on redirect examination was a direct response to the testimony elicited by the Commonwealth, and we think it prejudicial to the defendant to exclude his explanation. See, e.g., *Commonwealth* v. *Kerrigan*, 345 Mass. 508, 513 (1963); *Commonwealth* v. *Fatalo*, 345 Mass. 85, 86-88 (1962); *Commonwealth* v. *Goldberg*, 212 Mass. 88, 91 (1912). Cf. *Commonwealth* v. *Smith*, 329 Mass. 477, 479-481 (1952); *Commonwealth* v. *Galvin*, 310 Mass. 733, 747 (1942); *Commonwealth* v. *McCarthy*, 272 Mass. 107, 111-112 (1930); *Mahoney* v. *Gooch*, 246 Mass. 567, 570 (1923).

*Judgment reversed.*

*Verdict set aside.*

---

[13] The jury were instructed that the defendant's refusal to give a statement to the police was not evidence against him.