Commonwealth v. Latimore.

COMMONWEALTH vs. WILLIE R. LATIMORE.

Bristol. February 7, 1996. - July 11, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & FRIED, JJ.

*Constitutional Law,* Speedy trial. *Practice, Criminal,* Appeal, Conduct of prosecutor, Jury and jurors, Challenge to jurors, Instructions to jury, Reasonable doubt, Capital case. *District Attorney. Jury and Jurors.*

A criminal defendant, convicted in 1993 of murder in the second degree after a new trial was granted in 1992 on his 1976 conviction of murder in the first degree, was not entitled to dismissal of the indictment on the ground that he was denied due process or that his right to speedy trial was violated in the thirteen-year interval between the 1979 affirmance of his first conviction and the 1992 denial of the Commonwealth's application to appeal the order granting the motion for a new trial, where the defendant demonstrated no prejudice, where the defendant was heard during the interval on two motions for a new trial, an appeal and a petition for habeas corpus, and where, in any event, the right to a speedy trial is not relevant to delay in ordering retrial. [133-135] WILKINS, J., concurring.

A defendant charged with murder in the first degree who had been granted a new trial did not demonstrate any prosecutorial misconduct in the district attorney's consideration of and deference to the wishes of the victim's family in exercising his discretion to decline the defendant's offer of an *Alford* (*North Carolina* v. *Alford,* 400 U.S. 25 [1970]) plea to manslaughter. [135-137] WILKINS, J., concurring.

At a murder trial in which the defendant, who was black, raised the issue whether the prosecutor's peremptory challenges of three jurors were improperly based on their membership in a discrete group, the record demonstrated that the prosecutor advanced race-neutral bases for his challenges that the judge was warranted in accepting; the defendant's right to a jury selected on a nondiscriminatory basis was not violated. [137-139] WILKINS, J., concurring.

At a murder trial, the judge's instructions to the jury on reasonable doubt, based substantially on the language of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), created no reversible error. [139-140] WILKINS, J., concurring.

No reason appeared on the record of a first degree murder trial for this court to reduce the conviction of murder in the second degree to manslaughter or to order a new trial. [140] WILKINS, J., concurring.

INDICTMENT found and returned in the Superior Court on October 29, 1975.

A motion for a new trial, filed on June 28, 1991, was allowed by *James J. Nixon*, J., and the case was tried before *Patrick F. Brady*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Daniel F. Featherston, Jr.*, for the defendant.

*David B. Mark*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. After a trial by jury in 1976, the defendant, Willie R. Latimore, was convicted of murder in the first degree. We affirmed the conviction. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 679 (1979) (hereinafter *Latimore I*). In 1992, the defendant's motion for a new trial on the ground of constitutionally erroneous jury instructions was allowed. In 1993, his motion to dismiss the indictment on the ground of unreasonable delay was denied. On retrial, the defendant was convicted of murder in the second degree. The defendant appealed. We granted his application for direct appellate review. He claims that the motion and trial judges erred by: (1) denying his motion to dismiss the indictment; (2) failing to conduct an evidentiary hearing on prosecutorial misconduct; (3) allowing the prosecutor's peremptory challenges; and (4) instructing the jury on the meaning of "proof beyond a reasonable doubt" improperly. We conclude that there was no error. We also decline to exercise our extraordinary power under G. L. c. 278, § 33E (1994 ed.), to reduce the conviction of murder in the second degree to a lesser degree of guilt or to order a new trial.[1]

*Facts.* On the evening of October 18, 1975, at a tavern in Taunton called the Canadian Club (club), Philip Poirier was stabbed in the chest with an eight to ten inch knife or similar weapon. He died shortly after. Earlier that evening, the defendant and his brother Van (the only black patrons of the club that night), and a white female companion became noisy while playing pool. Poirier asked them to "keep it down." The defendant told Poirier, "Keep your mouth shut, you're

[1]The defendant was tried on an indictment for murder in the first degree prior to July 9, 1979. Consequently, his conviction for murder in the second degree is subject to review pursuant to G. L. c. 278, § 33E, as amended through St. 1974, c. 457. See St. 1979, c. 346, § 2; *Commonwealth* v. *Bembury*, 406 Mass. 552, 553 (1990); *Commonwealth* v. *Medeiros*, 395 Mass. 336, 352 n.6 (1985); *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980).

not behind the bar." The defendant and his party left the club a short time later.

They drove to a package store, then to Van's house to pick up Van's heart medication, then back to the club. The defendant reentered the club while his companions waited in the car. He approached the bar. Poirier said something to the defendant, to which the defendant responded, "When are you going to learn to keep your mouth shut?" Blows were exchanged. The two men grappled and "ended up on the floor . . . and it got to the point where [the victim] was on top of [the defendant], he had him straddled right down on the ground, on the floor. . . . He had his knees astride him and he had [the defendant on his back, his] two arms down on the floor . . . then . . . [the defendant] gave up . . . at that point [the victim] got up . . . [and] helped [the defendant] up. . . . He gave him his hand and took [the defendant's] hand and helped him up. . . . While they were standing there [the victim] said [to the defendant], 'Well, I got the worst of it.' He said, 'Look my shirt's all torn.' " Moments later Poirier said, "Oh, you son of a bitch." He staggered, then fell to the floor, and died from a single stab wound to the chest. The defendant ran to the car, started the engine, and drove away at a high rate of speed. The four eyewitnesses to the fight stated that they had neither observed the actual stabbing nor seen a knife in either party's possession at any time. No knife or other weapon was ever found.

The defendant's version was that he had returned to the club to search for his wallet, which he discovered was missing while at the package store. As to the fight itself, the defendant said that Poirier "reached around behind him while he was on top of me, and he pulled a knife out. . . . I grabbed his hand, and we were wrestling over the knife. . . . I felt . . . real nervous and scared. . . he was trying to press the knife into me, and . . . [the] only thing I could do is hold on. And then . . . I had to make a break. So, what I did was just roll him over, like flip him over off of me, and I just ran out the door."

*The first trial and appeal.* The judge at the first trial explained the meaning of "reasonable doubt" to the jury by analogy to the level of certainty a person would require in making decisions in life such as whether to take a new job. While the case was pending on appeal, we held that it was

unconstitutional to use examples from the jurors' lives in the definition of reasonable doubt. *Commonwealth* v. *Ferreira,* 373 Mass. 116 (1977).[2] In *Commonwealth* v. *Garcia,* 379 Mass. 422, 440-441 (1980), we stated that retroactive application of *Ferreira* was mandated by *In re Winship,* 397 U.S. 358 (1970).[3] Error in defining reasonable doubt creates "structural defects" not subject to harmless error analysis. *Sullivan* v. *Louisiana,* 508 U.S. 275, 281 (1993). In the defendant's appeal from the first trial, counsel did not raise the applicability of *Ferreira.* We did not raise or discuss it in our review of the record pursuant to G. L. c. 278, § 33E.

*Subsequent proceedings.* In 1982, the defendant filed a motion for new trial based in part on the trial judge's reasonable doubt instruction. The motion was denied, and, in 1983, a single justice of this court denied the defendant's application for leave to appeal.

In 1989,[4] the defendant petitioned for Federal habeas corpus review. Because Federal habeas corpus review is precluded if "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar," *Harris* v. *Reed,* 489 U.S. 255, 263 (1989), the Commonwealth moved the single justice to clarify his 1983 denial of leave to appeal. The question raised was whether the denial of leave to appeal was based on procedural default. The single justice reviewed the case, and in 1990 amended the 1983 order, nunc pro tunc, to state that leave to

---

[2]In *Ferreira,* we concluded that examples taken from the jurors' lives "understate[ ] and tend[ ] to trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt. . . . [T]he better course is that all references to examples taken from the jurors' lives should be avoided. . . . The degree of certainty required to convict is unique to the criminal law. We do not think that people customarily make private decisions according to this standard nor may it even be possible to do so. . . . Individuals may often have the luxury of undoing private mistakes; a verdict of guilty is frequently irrevocable." *Commonwealth* v. *Ferreira,* 373 Mass. 116, 128 n.11, 129-130 (1977). See *Commonwealth* v. *Rembiszewski,* 391 Mass. 123, 130-131 (1984); *Commonwealth* v. *Smith,* 381 Mass. 141, 144-145 (1980); *Ferreira, supra* at 128 n.11.

[3]See also *Griffith* v. *Kentucky,* 479 U.S. 314, 328 (1987) (new rules based on the Federal Constitution regarding conduct of criminal prosecution must be applied to cases then pending on direct appeal).

[4]The reason for the defendant's delay of six years before seeking such review is not in the record.

appeal had been denied for reasons of procedural default. The habeas corpus petition was accordingly withdrawn.

In 1992, the defendant's second motion for a new trial was allowed by a Superior Court judge. A single justice of this court denied the Commonwealth's application for leave to appeal. The second trial, from which this appeal is taken, took place in October, 1993. The jury returned a verdict of guilty of murder in the second degree.

1. *Due process and speedy trial.* The defendant draws our attention to the period beginning August 7, 1979, when we affirmed his first conviction, and ending November 18, 1992, when the single justice denied the Commonwealth's application to appeal the order for retrial. See *Commonwealth* v. *Levin,* 390 Mass. 857, 860-861 (1984) (reversal requiring new trial not final until appellate court issues rescript). He characterizes that interval as a "delay of the prospective retrial" which, he contends violated his rights to a speedy trial and to due process of law, as guaranteed by arts. 11 and 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the Constitution of the United States. We do not agree.

"[W]e have recognized on several occasions that 'deliberate blocking of appellate rights or inordinate and prejudicial delay [of an appeal] . . . may rise to the level of constitutional error." *Campiti* v. *Commonwealth,* 417 Mass. 454, 456 (1994), quoting *Commonwealth* v. *Hudson,* 404 Mass. 282, 284 (1989). Accord *Commonwealth* v. *Weichel,* 403 Mass. 103, 109 (1988); *United States* v. *Antoine,* 906 F.2d 1379, 1382 (9th Cir.), cert. denied, 498 U.S. 963 (1990) ("extreme delay in the processing of an appeal may amount to a violation of due process"). To prevail on a claim that due process was violated due to nondeliberate delay in the appellate process, a defendant must affirmatively demonstrate that the delay at issue was prejudicial. See *Commonwealth* v. *Libby,* 411 Mass. 177, 181 (1991); *Hudson, supra* at 285; *Weichel, supra* at 109.[5] This defendant has not met that burden. His reliance on a statement of the judge made prior to trial, that the delay

[5]Accord *Simmons* v. *Beyer,* 44 F.3d 1160, 1170 (3d Cir.), cert. denied, 116 S. Ct. 271 (1995) (claim which is unreviewable on reconstructed record constitutes "actual prejudice"); *Taylor* v. *Hargett,* 27 F.3d 483, 486 (10th Cir. 1994) ("Because petitioner has failed to establish any prejudice arising

would prejudice the trial, is misplaced. Now that the trial has taken place, the judge's pretrial speculations are irrelevant.

Furthermore, the period at issue here began with our decision in *Latimore I,* which *concluded* the appellate process. The defendant cites no case supporting the proposition that due process is violated simply because a long interval of time separated the conclusion of the appellate process from the subsequent order for a new trial. He argues, however, that *Doggett* v. *United States,* 505 U.S. 647 (1992), is analogous and should be applied in such circumstances. We do not agree.

In *Doggett,* the United States Supreme Court held that, regardless of its cause, excessive delay between indictment and prosecution "presumptively compromises the reliability of a trial." *Id.* at 655. The logic of *Doggett* does not apply here. Delay of an initial trial compromises reliability because of the risk that exculpatory evidence will be lost — either through the death, disappearance, or fading memory of witnesses, or through the loss or degradation of real evidence. See *United States* v. *Mohawk,* 20 F.3d 1480, 1487 (9th Cir. 1994). At a second trial, however, "[i]f important witnesses have become, for one reason or another, unavailable, their former testimony may be introduced at the second trial. . . . If memories have faded, they can be refreshed, using the record compiled in the first trial. . . . If key testimony unaccountably changes, it can be impeached by the same means. . . . As for the opportunity to collect exculpatory evidence, a defendant is in no sense deprived of this by a delay before retrial, so long as he was able to pursue this opportunity in connection with his original trial." (Citations omitted.) *Id.* at 1488. *Doggett,* therefore, does not apply to the defendant's retrial. See *Mohawk, supra* (holding *Doggett* inapplicable to delayed retrial: "Rather, we think the rules established in our prior cases remain valid . . . ").

We also note that, following *Latimore I,* the defendant was

---

from the delay in adjudicating his appeal, we conclude that the delay does not give rise to an independent due process claim"); *United States* v. *Mohawk,* 20 F.3d 1480, 1488 (9th Cir. 1994) (requiring defendant to show "actual trial prejudice in the event of a second prosecution in order to win outright dismissal"). But see *Harris* v. *Champion,* 15 F.3d 1538, 1563-1564 & n.15 (10th Cir. 1994) (no need to show particularized prejudice where delay is excessive).

heard on two motions for a new trial, a petition for leave to appeal from the denial of a motion for a new trial, and (in Federal court) a petition for habeas corpus. In light of the competing interests at stake, see *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976), we think these opportunities satisfy the demands of due process. Neither the Fourteenth Amendment nor art. 12 requires "every procedural protection that might help; [they] simply require[ ] that a private person have a basically fair opportunity to convince the decision maker." *Newman* v. *Burgin*, 930 F.2d 955, 961 (1st Cir. 1991).

The defendant's speedy trial claim requires only brief discussion. The right to a speedy trial does not apply to the appellate process. *Campiti* v. *Commonwealth*, 417 Mass. 454, 456 (1994); *Commonwealth* v. *Lee*, 394 Mass. 209, 220 (1985); *Commonwealth* v. *Weichel*, 403 Mass. 103, 109 (1988); *Simmons* v. *Beyer*, 44 F.3d 1160, 1169 (3d Cir.), cert. denied, 116 S. Ct. 271 (1995), even where prolonged proceedings delay retrial. See *Commonwealth* v. *Hudson*, 404 Mass. 282, 284 (1989); *Williams, petitioner*, 378 Mass. 623, 625-626 (1979); *Harris* v. *Champion*, 15 F.3d 1538, 1559 (10th Cir. 1994). Hence, the right to a speedy trial is not relevant to delay in ordering retrial. We conclude that there was no violation of the defendant's right to due process or of his right to a speedy trial. Thus, there was no error in denying the defendant's motion to dismiss the indictment.

2. *Prosecutorial misconduct.* While the second trial was pending, the defendant offered to make an *"Alford* plea" to manslaughter.[6] See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 388-389 (1989), discussing *North Carolina* v. *Alford*, 400 U.S. 25 (1970). The district attorney declined the offer, partly because the Poiriers (the victim's family) wanted the Commonwealth to pursue a murder conviction.

The defendant moved for an evidentiary hearing on prosecutorial misconduct. He argued that there was a "colorable basis" for believing that the district attorney subordinated the public interest to the wishes of the victim's family, and that if this were indeed the case, dismissal would be warranted. The judge denied the motion. There was no error.

[6]"Under *Alford*, a defendant who professes innocence may nevertheless plead guilty . . . if the State can demonstrate a 'strong factual basis' for the plea." *Commonwealth* v. *DelVerde*, 398 Mass. 288, 297 (1986), quoting *North Carolina* v. *Alford*, 400 U.S. 25, 38 (1970).

"A district attorney has wide discretion in determining whether to prosecute an individual, just as he has wide discretion in determining whether to discontinue a prosecution once commenced." *Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315, 318 (1977). Accord *Commonwealth* v. *Thurston*, 419 Mass. 101, 104 (1994); *Cambridge* v. *Phillips*, 415 Mass. 126, 130 (1993). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte* v. *United States*, 470 U.S. 598, 607 (1985).

The defendant properly observes that prosecutorial discretion is not completely unfettered. *Id.* at 608. The decision to prosecute may not be deliberately based "on an impermissible classification such as race, religion, or sex," *Commonwealth* v. *Franklin Fruit Co.*, 388 Mass. 228, 230 (1983); *Commonwealth* v. *Franklin*, 376 Mass. 885, 894 (1978), or because of the defendant's exercise of constitutional, statutory, or procedural rights. *Commonwealth* v. *Johnson*, 406 Mass. 533, 536-537 (1990); *Commonwealth* v. *McGovern*, 397 Mass. 863, 865-867 (1986). Accord *Wayte, supra*; *United States* v. *Bourgeois*, 964 F.2d 935, 938 (9th Cir.), cert. denied, 506 U.S. 901 (1992); *United States* v. *Penagaricano-Soler*, 911 F.2d 833, 837 (1st Cir. 1990). Here, however, the defendant does not claim that he was prosecuted because of his race, religion, or sex. Rather, he argues that the district attorney abused his discretion by giving undue weight to the wishes of the murdered man's family. We conclude that consideration of the family's concerns and desires is not the sort of impermissible motive which justifies judicial inquiry into the district attorney's exercise of discretion.[7]

General Laws c. 279, § 4B (1994 ed.), provides that the victim or family member may make a statement to the court as to the impact of the crime, which the judge may consider in imposing sentence. General Laws c. 258B, § 3 (1994 ed.), provides that victims may request that restitution be an ele-

---

[7]Cases cited by the defendant are inapposite. *Attorney Gen.* v. *Pelletier*, 240 Mass. 264 (1922), and *Attorney Gen.* v. *Tufts*, 239 Mass. 458 (1921), involved removal of district attorneys from office, not a particular defendant's right to dismissal. *Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315, 317-318 (1977), acknowledged the prosecutor's discretion to discontinue prosecution despite the victim's wishes. It did not state that the district attorney may not take the views of the victim or the victim's family into account. *Id.*

ment in the final disposition of a case, and that a victim may make or submit an impact statement to the court and to the parole board. We think that a district attorney similarly may consider the harm or impact to the victim and the victim's family, and may give deference to the views of the victim and the victim's family, when deciding whether to agree with the defendant and ask that the judge accept a plea to a lesser charge or to oppose the judge's acceptance of a defendant's plea to a lesser charge.

3. *Peremptory challenges.* The defendant is black. The prosecutor used two peremptory challenges to remove two nonwhite members of the venire, and used a third peremptory challenge to remove another member of the venire who stated in voir dire that she had "mixed race" in her family. Defense counsel objected that the prosecutor was improperly challenging members of the venire on the basis of their membership in a discrete group. The judge asked the prosecutor to state his reasons for the allegedly improper challenges. The prosecutor gave a number of plausible reasons for each challenge which the judge accepted. They are reproduced in the margin.[8] In the end, all the jurors were white.

---

[8]The prosecutor explained the peremptory challenges which defense counsel objected to as follows: "[Juror] 1-3. She was the second juror called in the individual questioning. . . . And my impression of her, which I wrote down on my note pad at the time, was that she appeared young, she wouldn't speak up, at one point she didn't even answer your Honor, you had to ask a question I think a second time and ask her to speak. She kept looking down. She didn't seem to want to look the Court in the eye when you were speaking with her and she appeared very tentative. I didn't take note of her race. I don't know what she is. Her name strikes me as being a Portuguese name but that's all I can say. But given her youth, I think she's only twenty-one, and how tentative she appeared, it struck me that she would not be a good person to have to decide a difficult case . . . .

"[Juror 1-15] appeared to me, your Honor, to be a white woman somewhere in her late forties. I was concerned about several things with her; one was that she only had a ninth grade education and that she had apparently no outside occupation in this world in her adult years. The fact that she had some sort of mixed race marriage somewhere in her family was of no concern to me. She mentioned that she had a domestic relations injunction case sometime, I gather, recently within the last year or so which tend to be very emotional types of things that the District Attorney's Office usually gets involved in, a [c.] 209A, and quite often they are resolved, if you will, in a fashion that isn't satisfactory to the person seeking the injunction, whether it's because they don't think the DA's office did a good job or because there's further trouble with the person that the

"When the issue of improper peremptory challenges is raised, the trial judge should make a finding as to whether the requisite prima facie showing of impropriety has been made." *Commonwealth* v. *Burnett*, 418 Mass. 769, 771 (1994). See *Commonwealth* v. *Soares*, 377 Mass. 461, 489-490, cert. denied, 444 U.S. 881 (1979). If the defendant raises the issue, "the burden shifts to the prosecutor to provide a group-neutral reason for challenging the venireperson in question. . . . Although the prosecutor's explanation does not have to rise to the level of specificity required for a removal for cause, general assertions are not enough. 'The prosecutor must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' *Batson* v. *Kentucky*, 476 U.S. 79, 98 n.20 (1986). . . . The reasons must be 'personal to the juror and not based on the juror's group affiliation.' *Commonwealth* v. *Young*, 401 Mass. 390,

---

injunction simply doesn't work against, it can happen in a number of ways, so that was a concern me. And finally, she just struck me as a little bit odd, O-D-D, and so my gut reaction was, since I had used, at that point, only one challenge, and we were early in the proceedings in terms of selecting a jury, it struck me that it was better to be on the safe side to challenge her and await some other juror that appeared to be more stable and more intelligent and more better educated than one that didn't have this other baggage and one that had been out in the world more, so I challenged her. But it was not for racial reasons. She appeared to me to be a white woman. . . .

"That brings me to the most recent challenge which is objected to apparently, and that would be [Juror 5-2]. In general, Judge, first of all, I don't see [Juror 5-2] as a — and this may be my own limitation, but I don't see [Juror 5-2] as a black man at all which the defendant, is a black man. He strikes me — he looks to me as if he's a Portuguese man and I assume if you categorize him racially I assume he's a white person but I don't know. His skin is somewhat darker tone than, for example, your Honor's or mine but I don't know what race he is but I don't see him as a black man sitting up there. My concern with him really revolves around a constellation of issues where he's quite youthful, he's only 22, he's a full-time student in school and my own experience is generally with jurors is that young people still in school tend to be much more liberal in their views of society and issues because of their lack of experience out in life than the general population. And when that is combined with the fact that I believe he was wearing only a sweatshirt to come here for what is a serious public obligation, to appear in Superior Court, the juror, unlike many of the jurors who have come very well dressed today, as your Honor knows, many of the gentlemen were wearing suits or sport coats with ties and so on, and this young fellow shows up in a sweatshirt. He doesn't strike me as the type of person, given all of that, who's appropriate to sit on jury to decide a case like this and so I challenged him. It has nothing to do with the racial question at all. I don't even know what race he is and I don't think he's a black man."

401 (1987)." *Burnett, supra* at 771. Accord *Commonwealth* v. *Vann Long,* 419 Mass. 798, 806-807 (1995); *Soares, supra* at 491. If such reasons are given, "the judge should specifically determine whether they were bona fide or a mere sham." *Commonwealth* v. *Green,* 420 Mass. 771, 778 (1995). See *Commonwealth* v. *Valentin,* 420 Mass. 263, 269 (1995).

Here, the judge shifted the burden to the Commonwealth without first finding that the defendant had made a sufficient showing of impropriety. See *Green, supra* at 776; *Burnett, supra* at 771; *Soares, supra* at 489-490. Nevertheless, "[t]he record shows to our satisfaction that the prosecutor advanced . . . race-neutral bas[es] for the challenge[s]," *Commonwealth* v. *Herbert,* 421 Mass. 307, 315 (1995), which were "clear and reasonably specific . . . [and] personal to the juror." *Green, supra* at 778. The judge accepted those reasons as bona fide, and that determination "is entitled to substantial deference on appeal." *Valentin, supra* at 269. Accord *Burnett, supra.* We conclude that the trial judge's determination — that the defendant's right to a jury selected on a nondiscriminatory basis was not violated — was not erroneous.

4. *Jury instructions.* The judge's instruction on reasonable doubt is reproduced in the margin.[9] The defendant claims that the judge's use of the phrase "moral certainty" consti-

[9]The judge charged the jury on reasonable doubt as follows:

"Now, as I have said, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charge against him. What is proof beyond a reasonable doubt? The term is often used and probably pretty well understood though it is not easily defined. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt for everything in the lives of human beings is open to some possible or imaginary doubt. A charge is proved beyond a reasonable doubt if after you have compared and considered all of the evidence you have in your minds an abiding conviction to a moral certainty that the charge is true.

"I have told you that every person is presumed to be innocent until he is proven guilty and that the burden of proof is on the prosecutor. If you evaluate all the evidence and you still have a reasonable doubt remaining, the defendant is entitled to the benefit of that doubt and must be acquitted. It is not enough for the Commonwealth to establish a probability, even a strong probability, that the defendant is more likely to be guilty than not guilty, that is not enough.

"Instead, the evidence must convince you of the defendant's guilt to a reasonable and moral certainty; a certainty that convinces your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence. That is what we mean by proof beyond a reasonable doubt."

tutes reversible error. We do not agree. The instruction was substantially based on the language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), which was ruled constitutional by the United States Supreme Court in *Victor* v. *Nebraska*, 511 U.S. 1, 8-17 (1994), and by us, since *Victor*, in *Commonwealth* v. *Shanahan*, 422 Mass. 631, 632 (1996); *Commonwealth* v. *Robbins*, 422 Mass. 305, 316 n.8 (1996); and *Commonwealth* v. *Pinckney*, 419 Mass. 341, 344-345 (1995). There was no error.

5. *General Laws c. 278, § 33E.* We have reviewed this conviction pursuant to G. L. c. 278, § 33E. We conclude that there was no legal error at trial and no reason to reduce the conviction of murder in the second degree to a lesser degree of guilt or to order a new trial.

*Judgment affirmed.*

WILKINS, J. (concurring). I am troubled that the inordinate delay in the defendant's retrial was caused by the failure of the process for permitting appellate review of postconviction challenges subject to G. L. c. 278, § 33E (1994 ed.). That process places unreviewable authority in one judge to deny full court review. See *Leaster* v. *Commonwealth*, 385 Mass. 547, 548 (1982). When this case was here on appeal in 1979, the error in the jury instructions (not argued by then defense counsel) was not as clearly a ground for reversal of the conviction under G. L. c. 278, § 33E, as it was a ground for reversal on constitutional principles four years later. Four years later, however, leave to appeal to the full bench from denial of the defendant's new trial motion was not granted. In my view leave to appeal to the full court should have been granted.

I see no fault in the court's reasoning on the issues argued zealously by the defendant's counsel. The circumstances of the crime do not warrant a reduction to manslaughter, and I am not aware that society's interest in the imposition of an appropriate sentence must be bent to provide for a manslaughter conviction in order to atone for a failure in the system that only speculatively may have prejudiced the defendant.