COMMONWEALTH *vs.* RICHARD E. WILSON, JR.

No. 98-P-418.

Norfolk. September 13, 1999. - June 16, 2000.

Present: PERRETTA, GREENBERG, & LENK, JJ.

*Evidence,* Relevancy and materiality, Credibility of witness. *Witness,* Credibility.

At the trial of a complaint for assault and battery by the defendant on his then spouse, testimony of their daughter that the defendant at that time abused drugs and alcohol and kept weapons in his car and home was irrelevant to the issue whether the assault had actually occurred, and its admission was error [432-433]; where the inadmissible evidence was prejudicial and the evidence against the defendant was not overwhelming, a substantial risk of a miscarriage of justice was created, and a new trial was required [433-435].

COMPLAINT received and sworn to in the Quincy Division of the District Court Department on January 7, 1997.

The case was tried before *Joseph R. Welch,* J.

*Kimberly Wittenberg Lurie* for the defendant.

*Glenn A. Cunha,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On January 7, 1997, a criminal complaint was brought against the defendant, alleging that he assaulted and beat Mary Joan Wilson on January 29, 1994. See G. L. c. 265, § 13A. Although the complainant and the defendant were husband and wife on the date of the alleged offense, they divorced sometime in 1995. The theory of defense at trial was that the alleged offense never happened and that the complaint was brought because of a postdivorce dispute between the parties concerning Florida real estate. On appeal, the defendant argues that his daughter's testimony that he abused drugs and alcohol and kept weapons in his car and home created a substantial risk of a miscarriage of justice. We agree and reverse the conviction.

1. *The evidence.* Mary Joan Wilson (Mary) testified that on January 29, 1994, she arrived at Logan Airport after a trip to Florida. The defendant was there to meet and drive her to their marital residence, an apartment in Quincy. Once inside the lobby of the apartment building, the defendant told Mary to call their daughter, Lisa. Lisa resided in Ipswich with her husband and children. Because Mary had had the telephone in their apartment disconnected months earlier on account of the defendant's excessive calls to someone in Florida, she went to a pay phone in the lobby. After Mary completed her brief conversation with Lisa, the defendant said, "Isn't this nice that we have to call our daughter this way, you . . . [expletive]," smashed her head against the cement wall three times, and then went up to their fifth-floor apartment. Hurt and frightened, Mary left the building and drove to the home of her daughter and son-in-law. The drive to Ipswich took about seventy-five minutes. Mary stated that her head was swollen and that she was bleeding from a laceration. Although it was late when she arrived, her daughter had not yet retired. While Lisa applied ice cubes and face cloths to Mary's injuries, Mary told her what had happened. Mary testified that she remained at Lisa's home for about three days and then decided to return to the marital residence in Quincy. She stated that she returned to Quincy because she did not want to intrude upon her daughter and son-in-law any longer, and she had no other place to go.

On cross-examination, Mary readily acknowledged that she did not complain to the police about the defendant until 1997, and that prior to that date, she told no one other than her daughter about the assault and, even then, only to explain her unexpected arrival in Ipswich. She also stated that, before leaving her daughter's home to return to Quincy, she first called her son, Richard, who also resided in the apartment, to tell him what had happened and to make certain that he would be home should she need his protection against the defendant. Mary stated that she brought the complaint after a three-year time lapse because the defendant "had returned to [Massachusetts]." She also acknowledged that, subsequent to the divorce, the defendant initiated legal claims against her regarding a Florida condominium and that the dispute was resolved in her favor "in the past year."

Lisa testified and corroborated her mother's arrival in Ipswich and her injuries. She also related that, although the

defendant had always been good to her — indeed, she thought of herself as the "Mafia Princess"[1] — there had been little contact between the defendant and her family in the "past few years," and her children had asked her why the defendant "was mean to Grammy." Lisa described the relationship between her mother and father as "stormy" and stated that she tried to convince her mother "to get out of the situation . . . [s]he [Mary] was fearful, afraid of him." The transcript next reflects the following exchange between the prosecutor and Lisa:

*Q.:* "And so how many days did she stay with you?"

*A.:* "Three nights."

*Q.:* "And then what happened after that?"

*A.:* "And they talked on the phone. I don't know if they made up. She went back. She had to get to work. She wanted to check on my brother. She didn't know how stable that situation was with him there — the two of them were abusing drugs and alcohol together . . . ."

Defense counsel: "Objection, your Honor."

The court: "Yeah. Overruled."

*Q.:* "Go ahead."

*A.:* "My brother and my father were abusing drugs and alcohol together and there were weapons in the home and in the trunk of the car and things like that. And she just tried to keep the peace and tried to go on for me and my kids, basically. My other brother's in California and has no contact with my father and tells people that his father's dead."

Testifying on behalf of his father, Richard related that on January 29, 1994, his father and mother returned home and came into the apartment. He and his mother exchanged pleasantries and sat down to dinner. The defendant, as was his custom, took his meal in his bedroom. According to Richard, his father, as a result of medical problems, had difficulty eating

---

[1]Although the defendant's objection to that statement was sustained, he did not move to strike it.

and chose to do so alone. Richard also testified that, during the three days following his mother's return from Florida, she followed her usual routine, that is, going to work at 7:00 A.M. and returning home at about 5:00 P.M. He further stated that the first time he heard anything about his mother's allegation against his father was about eight months prior to trial, when his father called him after his arrest. Richard also testified that, had he heard that his father had assaulted his mother, he would have ascertained whether she needed medical attention and then confronted his father.

On cross-examination, the prosecutor asked Richard if he was confused about the events of January 29, 1994, and whether he had been drinking or taking drugs that day. Richard answered no to each of the questions. The prosecutor next asked him about his mother's testimony concerning her telephone call to him three days after the incident, and Richard stated that he never had such a conversation with his mother. When asked to describe his relationship with his mother, Richard stated that they were "extremely close," both in 1994, and at the time of trial. The prosecutor asked whether Richard had heard his sister's testimony, and he answered that he had. Next, the prosecutor asked, "Are you saying your sister's lying?"[2] Richard responded, "That's her . . . remembrance of the truth. I don't believe it's the truth. That is her recollection of the truth. I don't want to call my sister a liar. We're very close as well."

2. *Discussion.* Relying upon *Commonwealth* v. *Errington*, 390 Mass. 875 (1984), the Commonwealth argues that Lisa's testimony was relevant to the issue of Mary's credibility on the question of why, in the circumstances related by Mary, she nonetheless decided to return to Quincy within three days of the assault. However, we think *Errington* readily distinguishable from the present case.

In *Errington*, the complaining witness was questioned about her delay in making a complaint against the defendant. *Id.* at 876-877. Here, Mary, the complaining witness, was specifically asked why she returned to Quincy after staying in Ipswich for

---

[2]Trial counsel did not object to this improper question, and appellate counsel does not pursue the matter on appeal. See *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400 (1983) (single improper question did not require reversal). Contrast *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 708-710 (1984) (improper question repeatedly put to witness required new trial).

only three days. She said nothing about drugs, alcohol, or weapons, and explained that she returned to the marital residence because she did not want to intrude upon her daughter and son-in-law any longer and that she had nowhere else to go. There is nothing to show that Lisa's different explanation for her mother's departure was based upon Lisa's personal knowledge. We, therefore, conclude that the defendant's objection to Lisa's testimony, that her mother wanted to check up on Richard because Mary was worried that he and the defendant were abusing drugs and alcohol and had firearms in their possession, should have been sustained. See *Commonwealth* v. *Martin*, 417 Mass. 187, 189-190 (1994) (witness's belief and suspicion irrelevant because not based upon either first-hand knowledge or fact). Contrast *Commonwealth* v. *Errington*, 390 Mass. at 881 (complaining witness's explanation for delayed complaint held relevant and competent). See generally Liacos, Massachusetts Evidence § 6.5 (7th ed. 1999).

In arguing that the defendant's conviction must be reversed, appellate counsel proceeds on the premise that trial counsel failed to preserve the claim by failing to object a second time after Lisa repeated and enlarged upon the earlier response that triggered the first objection. But see *Commonwealth* v. *Martin*, 417 Mass. at 191. Because we conclude that the error created a substantial risk of a miscarriage of justice, see *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), we need not consider whether reversal would be warranted under a more favorable standard of review.

To determine whether an error created a substantial risk of a miscarriage of justice, "we consider the strength of the Commonwealth's case against the defendant (without consideration of any evidence erroneously admitted), the nature of the error, whether the error is 'sufficiently significant in the context of the trial to make plausible an inference that the [jury's] result might have been otherwise but for the error,' *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986), and whether it can be inferred 'from the record that counsel's failure to object was not simply a reasonable tactical decision.' *Id.*" *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999) (footnotes omitted).

We do not think that the Commonwealth's case against the defendant can be "characterized as one in which the evidence pointed overwhelmingly to guilt." *Commonwealth* v. *Miranda*, *supra* at 22. There were no percipient witnesses to the assault,

Mary returned to the marital residence where she thereafter resided until the defendant left Massachusetts, there was a three-year time lapse between the assault and the complaint during which the parties were divorced and embroiled in postdivorce legal proceedings, and there was an absence of any medical evidence concerning Mary's injuries. In short, this was a "classic duel of credibility," *Commonwealth* v. *Ferreira*, 373 Mass. 116, 127 (1977), in which corroboration of Mary's flight to Ipswich and her injuries was significant to the Commonwealth. Lisa described Mary's condition upon her arrival. On the other hand, Richard testified to the effect that his mother never went to Ipswich, that she arrived home as expected, that she went about her normal routine, and that, had she appeared bruised or otherwise harmed, he would have sought medical attention for her and then confronted the defendant.

Lisa went too far when she went beyond her description of Mary's condition upon her arrival in Ipswich. Not only did the jury hear her describe herself as a "Mafia Princess" (see note 1, *supra*), she related how her children questioned her about the defendant's "mean" treatment of Mary. Even assuming this testimony was admissible, Lisa was next allowed to put her thumb on her mother's side of the scales when she claimed, contrary to Mary's testimony, that her mother left the safety of Ipswich because the defendant and Richard were substance abusers in possession of firearms. Lisa's testimony not only directly prejudiced the defendant, it also significantly harmed him by giving the jury an unfounded basis for disbelieving his sole witness, Richard.

It is immaterial that the prosecutor made no mention of Lisa's inadmissible testimony in his closing argument. He argued, instead, that Richard's testimony that on the day in issue his mother's activities were consistent with her normal routine should not be believed because of the passage of time. Although hardly decisive, we note that the jury, during their deliberations, requested record repetition of the testimony given by Mary and the officer to whom she reported the incident three years later.

Based upon the circumstances presented, we are unable to conclude that Lisa's inadmissible testimony did not have a material influence upon the jury's verdict. Our conclusion makes it unnecessary to consider the defendant's additional claim, that the prosecutor's closing argument also gave rise to a substantial risk of a miscarriage of justice. It is enough to state that, in the

event of a retrial, the prosecutor should not argue or suggest that the defendant had abused Mary for thirty-four years, the length of their marriage, until and unless evidence of such prolonged abuse is offered by the Commonwealth and deemed admissible.

*Judgment reversed.*

*Verdict set aside.*